Louis L. GOLDSTEIN, Comptroller of the Treasury of the State of Maryland; and State of Maryland

v.

G. William MILLER, Secretary of the Treasury; and G. R. Dickerson, Director of the Bureau of Alcohol, Tobacco and Firearms.

The OVERBROOK EGG NOG CORPORA-TION, a Maryland Corporation; and Heublein, Inc., a Connecticut Corporation

v.

G. William MILLER, Secretary of the Treasury; and G. R. Dickerson, Director of the Bureau of Alcohol, Tobacco and Firearms.

Civ. Nos. K-79-2163, K-79-2164.

United States District Court, D. Maryland.

Feb. 29, 1980.

On Motions For Injunction Pending Appeal April 25, 1980.

Stephen H. Sachs, Atty. Gen. of Maryland, and Gerald Langbaum, Asst. Atty. Gen., Baltimore, Md., for plaintiffs in Civil No. K–79–2163.

Steve G. Gilden, and Wartzman, Rombro, Rudd & Omansky, P. A., Baltimore, Md., for plaintiff The Overbrook Egg Nog Corp.

Morton Siegel, Chicago, Ill., and Harold V. Gorman, Jr., Hartford, Conn., for plaintiff Heublein, Inc., in Civil No. K–79–2164.

Alice Daniel, Acting Asst. Atty. Gen., Washington, D. C., Russell T. Baker, Jr., U. S. Atty., Ellen Lipton Hollander, Asst. U. S. Atty., Baltimore, Md., William P. Arnold and Sandra M. Schraibman, Attys., Department of Justice, Washington, D. C., for defendants.

FRANK A. KAUFMAN, District Judge.

These two cases present the question of whether the federal government acting pursuant to its taxing power may restrict, by federal regulation, the number of bottle sizes which may be used in bottling distilled spirits in Maryland for sale within Maryland's borders. Plaintiffs in Civil No. K–79–2163 are the Comptroller of the Treasury of the State of Maryland and the State itself. Plaintiffs in Civil No. K–79–2164 are The Overbrook Egg Nog Corporation and Heublein, Inc. Defendants in both cases are the Secretary of the Treasury and the Director of the Bureau of Alcohol, Tobacco and Firearms. Jurisdiction in both cases exists under 28 U.S.C. § 1331. All plaintiffs seek injunctive and declaratory relief to prevent the said federal regulation from becoming effective. Initially, the regulation was to go into effect on January 1, 1980. However, by agreement of the parties hereto, the regulation has been held in abeyance pending the filing of the within opinion.

## FACTS

The relevant and material facts are undisputed and disclose the following:

1. Louis L. Goldstein is the Comptroller of the Treasury of the State of Maryland and has the responsibility under the laws of Maryland for the regulation of the manufacture, sale, distribution, transportation and storage of alcoholic beverages within Maryland.

2. The Overbrook Egg Nog Corporation is a Maryland corporation licensed by the State to engage in business as a bottler of distilled spirits within Maryland. Overbrook also holds a permit from the Department of the Treasury to operate as a rectifier and distiller and pays federal tax to and registers with the Treasury as a rectifier.

3. Heublein, Inc. is a Connecticut corporation which manufactures and produces distilled spirits outside of Maryland, and has a permit from the State of Maryland allowing it to sell, consign, and deliver alcoholic beverages from outside of Maryland to persons in Maryland, including Overbrook, who are authorized to receive such spirits in Maryland. Heublein holds a Treasury permit to act as a distiller, pays federal taxes as a distiller and registers with the Treasury as such.

4. G. William Miller is the Secretary of the Treasury of the United States.

5. G. R. Dickerson is the Director of the Bureau of Alcohol, Tobacco and Firearms (ATF), a bureau within the Treasury Department.

6. On March 10, 1976, the ATF adopted final regulations establishing metric standards of fill (liquor-bottle sizes) under 27 C.F.R. Part 5, relating to the sale, shipment, or introduction of bottled distilled spirits in interstate or foreign commerce, which list of bottle sizes did not include a 118 milliliter (the approximate metric equivalent of the quarter-pint) standard of fill. The regulations were promulgated under the Federal Alcohol Administration Act, 27 U.S.C. §§ 201 et seq. The list of permitted bottle sizes appears at 27 C.F.R. § 5.47a.

7. On Oct. 26, 1976, ATF adopted final regulations implementing metric standards of fill for distilled-spirits bottles under the authority of the Internal Revenue Code of 1954, 26 U.S.C. § 5301. Those regulations included an amendment to 27 C.F.R. § 201.-540b which adopted the metric standards of fill of 27 C.F.R. § 5.47a, but provided an exception to permit the use of four-ounce (quarter-pint) liquor bottles through December 31, 1979 for the packaging of distilled spirits in intrastate commerce only.

8. On November 16, 1979, the State of Maryland, acting through Comptroller Goldstein, adopted a final regulation, Code of Maryland Regulations (COMAR) 03.02.-01.06, establishing within Maryland, as of January 1, 1980, the metric standards of fill previously adopted by ATF, and additionally allowing the use of the 118 milliliter bottle in intrastate commerce within Maryland.

9. Since 1950 Overbrook has bottled in Maryland distilled spirits in quarter-pint (118 milliliter) bottles for Heublein and four other out-of-state manufacturers and producers of distilled spirits.

10. Overbrook's bottling process has taken and presently continues to take place at Overbook's plant in Baltimore, Maryland. The liquor is shipped in bulk by Heublein from Connecticut to Maryland. The bottles, caps, and labels are shipped to Overbrook from locations within and without Maryland. The labels on the filled bottles state that the bottles are for sale within Maryland only. The filled bottles are stored at the Overbrook plant in Maryland until picked up by Maryland distributors for distribution to Maryland retailers.

## STATUTES AND REGULATIONS

The regulation at the core of the dispute in the within cases is 27 C.F.R. § 201.540b, which provides in relevant part:

> Liquor bottles shall conform to the applicable standards of fill provided in Subpart E of 27 CFR Part 5, including those for liquor bottles of less than 200 ml. capacity. The use of any bottle size other than as authorized in Subpart E of 27 CFR Part 5 is prohibited for the packaging of distilled spirits for domestic purposes, except that 4-ounce liquor bottles may be used through December 31, 1979, for packaging any distilled spirits, other than spirits bottled in bond after determination of tax, on bottling premises for sale in intrastate commerce only.

In 27 C.F.R. § 201.540b, defendants incorporated by reference the list of bottle sizes from 27 C.F.R. Part 5 Subpart E, but did

not adopt any other part of that regulation. 27 C.F.R. § 201.540b was promulgated pursuant to 26 U.S.C. § 5301(a), a provision of the Internal Revenue Code, which states in relevant part:

(a) Requirements.—Whenever in his judgment such action is necessary to protect the revenue, the Secretary or his delegate is authorized, by the regulations prescribed by him and permits issued thereunder if required by him—

(1) to regulate the kind, size, branding, marking, sale, resale, possession, use, and reuse of containers (of a capacity of not more than 5 wine gallons) designed or intended for use for the sale of distilled spirits * * *.

26 U.S.C. § 5301 was enacted "to protect the revenue" and thus pursuant to the taxing power of Congress, embodied in the United States Constitution, Article I, Section 8, Clause 1, which contains the following authorization:

· The Congress shall have Power To lay and collect taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States * * *.

The substantive provisions of both 26 U.S.C. § 5301 and 27 C.F.R. § 201.540b have been in existence for approximately forty-six years with wording and impact substantially similar to the wording and impact which they have today. 26 U.S.C. § 5301 was first approved by the Congress on June 18, 1934, in the form of House Joint Resolution 370 (48 Stat. 1020), which states:

Joint Resolution To protect the revenue by regulation of the traffic in containers of distilled spirits

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That whenever in his judgment such action is

necessary to protect the revenue, the Secretary of the Treasury is authorized by the regulations prescribed by him, and permits issued thereunder if required by him (1) to regulate the size, branding, marking, sale, resale, possession, use, and re-use of containers * * * designed or intended for use for the sale at retail of distilled spirits * * *.

H.J.Res. 370 became 26 U.S.C. § 2871 in the Internal Revenue Code of 1939. The above-quoted language in H.J.Res. 370 remained the same. In 1954, when Congress revised the Internal Revenue Code, section 2871 was reenacted as 26 U.S.C. § 5214 with its language left virtually intact.[1] In 1958, the above-quoted portion of H.J.Res. 370 became that part of 26 U.S.C. § 5301(a) quoted *supra* at p. 159.

Immediately after the passage of H.J. Res. 370 in 1934, and pursuant to the authority therein conferred upon him, the Secretary of the Treasury promulgated Regulations 13. Article 3 of Regulations 13 states that "the use for packaging distilled spirits for sale at retail of containers of one-half pint capacity or greater, other than liquor bottles as herein defined and otherwise conforming to these regulations, is prohibited * * *." Appendix B of Regulations 13, as originally promulgated in 1934, and as revised in April of 1935, sets forth the following standards of fill, namely, 1 gallon, ½ gallon, 1 quart, ⅘ quart, 1 pint, and ½ pint, and provided that certain types of liquor might also be bottled in ⅘ pint bottles.[2] The standards of fill set forth in Appendix B were exclusive for all liquor bottles of greater than ½ pint capacity. As Article 3 of Regulations 13 indicated, however, the federal government did not at that time seek to regulate bottle sizes for bottles of under ½ pint capacity.

In 1940, pursuant to the authority granted by 26 U.S.C. § 2871,[3] the Secretary pro-

1. H.R.Rep. No. 1337, 83d Cong., 2d Sess. (1954), *reprinted in* 1954 U.S.Code Cong. & Admin.News, pp. 4019, 4499; S.Rep. [Unnumbered], 83d Cong., 2d Sess. (1954), *reprinted in* 1954 U.S.Code Cong. & Admin.News, pp. 4621, 5160.

2. As originally promulgated in 1934, Regulations 13 also included certain temporary permissible standards of fill.

3. Present 26 U.S.C. § 5301(a) was then so codified.

mulgated Regulations 6 § 188.70, in which he extended the regulation of bottled-in-bond liquor to bottle sizes of ½ pint and under. At that time, the only permissible sizes for bottled-in-bond liquor equal to or under ½ pint became ½ pint, ⅛ pint, ⅒ pint, and, for brandy, ⅟₁₈ pint.[4]

The 1934 and 1940 regulations remained essentially the same—although occasionally recodified—until 1968. In 1968, the bottle sizes for bottled-in-bond liquor and for all other bottling were combined by the Secretary into one regulation, 26 C.F.R. § 201.-540b, which provided, in relevant part:

> Liquor bottles shall conform to the applicable standards of fill provided in Subpart H of 27 CFR Part 5, including those for liquor bottles of less than ½-pint capacity. The use of any bottle size other than as authorized in Subpart H of 27 CFR Part 5 is prohibited for the packaging of distilled spirits for domestic purposes, except that 4-ounce liquor bottles may be used for packaging any distilled spirits on bottling premises for sale in intrastate commerce only.

*See* 33 Fed.Reg. 6816 (May 4, 1968).

The regulation remained essentially the same until 1976. On August 30, 1976, ATF published a notice of proposed rulemaking to amend 26 C.F.R. § 201.540b to permit metric-size bottles only.[5] The notice of August 30, 1976 also proposed further to amend 26 C.F.R. § 201.540b by prohibiting the use of ¼ pint liquor bottles after December 31, 1979.[6] That notice invited the submission of written comments or other materials by September 29, 1976, and stated that ATF believed that the change to metric bottle sizes would result in "reduction in the number of bottle sizes," and that such reduction was supported by the industry because of cost considerations and would facilitate ATF recordkeeping requirements.[7] Two comments were received, neither from any of plaintiffs in the within two cases, and neither opposed abolition of the quarter pint bottle.[8] The proposed amendments became effective on October 26, 1976.[9]

On March 10, 1976, ATF issued final rules, amending 27 C.F.R. Part 5 to permit metric-size bottles only. Unlike the standards of fill established in 27 C.F.R. § 201.-540b, which were promulgated pursuant to a provision in the Internal Revenue Code, the metric bottle sizes set forth in 27 C.F.R. Part 5 Subpart E were established pursuant to 27 U.S.C. § 205, part of the Federal Alcohol Administration Act (FAA Act).[10]

---

**4.** Prior to 1968, the federal government did not restrict bottle sizes under one-half pint for liquor not bottled-in-bond, although *all* bottle sizes for bottled-in-bond liquor were seemingly regulated. After 1968, *all* bottle sizes for liquor (whether or not bottled-in-bond) were regulated.

**5.** 41 Fed.Reg. 36503 (1976).

**6.** 26 C.F.R. § 201.540b was also renumbered *27* C.F.R. § 201.540b.

**7.** *See* 41 Fed.Reg. 36499–500.

**8.** 41 Fed.Reg. 46850 (1976).

**9.** In 1979, the Congress enacted the Distilled Spirits Tax Revision Act of 1979, Title VIII of P.L. 96–39, 96th Cong., 1st Sess. That new law—a tax law—changed the Internal Revenue Code liquor provisions in certain respects. In order to implement that new law, the regulations contained in 27 C.F.R. § 201 were revised and renumbered. Their effective date was January 1, 1980. 44 Fed.Reg. 71629 (December 11, 1979). 27 C.F.R. § 201.540b is now to be found at 27 C.F.R. § 19.632. That latter provision is identical to 27 C.F.R. § 201.540b, except that the exemption (until January 1, 1980, the effective date of the renumbered regulations) of quarter-pint bottles has been omitted from § 19.632.

In renumbering section 201.540b as section 19.632, the Secretary reiterated that that regulation was promulgated pursuant to 27 U.S.C. § 5301. 44 Fed.Reg. 71676 (December 11, 1979). That regulation, *i. e.*, 27 C.F.R. § 201.-540b, was so numbered at the time the within cases were filed and is so referred to hereinafter.

**10.** The preamble of 27 U.S.C. § 205 reads as follows:

§ 205. Unfair competition and unlawful practices.

It shall be unlawful for any person engaged in business as a distiller, brewer, rectifier, blender, or other producer, or as an importer or wholesaler, of distilled spirits, wine, or malt beverages, or as a bottler, or warehouseman and bottler, or distilled spirits, directly or indirectly or through an affiliate: * * *.

Pursuant to its final rules, ATF amended 27 C.F.R. § 5.47(a) to read as follows:

*Authorized standards of fill.* On or after January 1, 1980, the standards of fill for all distilled spirits, whether domestically bottled or imported, shall be as follows:

| | |
|---|---|
| 1.75 liters | 500 milliliters |
| 1.00 liter | 200 milliliters |
| 750 milliliters | 50 milliliters |

Under ATF's final rules, beginning on October 26, 1976, the use of metric (as opposed to English) sizes became optional until December 31, 1979 and became mandatory on January 1, 1980. 41 Fed.Reg. 36499 (August 30, 1976).

Unlike 27 C.F.R. § 201.540b, which applies to "domestic" commerce, 27 C.F.R. Part 5 Subpart E is applicable only to "interstate or foreign commerce."[11] The regulations in 27 C.F.R. § 5.49(a) set forth the number of bottles of each size which are to be packed in a shipping case. Thus, the regulation requires that the number of bottles in any given case be determined by the size of those bottles.

The amendments to 27 C.F.R. Part 5 Subpart E converted the standards of fill from English to metric capacities, and authorized the above-mentioned six sizes. The metric equivalent of the quarter-pint bottle (118 milliliters) was not included. Prior to the adoption of the metric system, 27 C.F.R. § 5.47(a) authorized for foreign and interstate use 10 standards of fill: 1 gallon, one-half gallon, 1 quart, four-fifths quart, 1 pint, four-fifths pint, one-half pint, one-eighth pint, one-tenth pint, and one-sixteenth pint (brandy only). A bottle size of one-quarter pint was not included in that list. Until the amendment in 1976 of 27 C.F.R. § 201.540b, however, quarter-pint

(118 milliliter) bottles were not prohibited for *intrastate* use. *See* p. 158, *supra.*

27 C.F.R. Part 5 applies to interstate and seemingly not to intrastate commerce. The power of the Congress over foreign and interstate commerce is embodied in the following words of the Commerce Clause of the United States Constitution, Article I, Section 8, Clause 3: "[The Congress shall have Power] To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes * * *." The scope of congressional power to regulate liquor is, however, affected by the Twenty-first Amendment to the United States Constitution, Section 2, which reads as follows: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

Pursuant to Md.Ann.Code Art. 2B §§ 184–85, under which the Comptroller is empowered to promulgate regulations to enforce his duties under Maryland's alcoholic beverages article, the Comptroller in 1979 amended COMAR 03.02.01.06 to read, in relevant part, as follows:

D. Standard of fill for containers of distilled spirits. Effective January 1, 1980, the standard of fill for distilled spirits shall be identical with those of the Bureau of Alcohol, Tobacco and Firearms. The only exception is that the 118. milliliters (¼ pint) is a permitted standard of fill in this State for intra-state purposes only.

Proposed, 6 Md.Reg. 1459 (September 7, 1979); adopted, 6 Md.Reg. 1838 (November

The preamble to section 205 does not recite the particular power of the Congress under which 27 U.S.C. § 205 was enacted. However, each of the subsections of section 205 refers throughout to "interstate or foreign commerce" and the applicability of the subsections of section 205 to "interstate or foreign commerce." That is to be contrasted with 27 U.S.C. § 203, which prevents persons from engaging in interstate or foreign commerce in liquor without first obtaining a Treasury permit. That section of the FAA Act was passed—

In order effectively to regulate interstate and foreign commerce in distilled spirits, wine, and malt beverages, to enforce the twenty-first amendment, and to protect the revenue and enforce the postal laws with respect to distilled spirits, wine, and malt beverages: * * *.
27 U.S.C. § 205 was seemingly aimed only at the regulation of interstate or foreign commerce as such. *See* n.13, *infra.*

11. 27 C.F.R. § 5.45.

16, 1979). That Maryland regulation is still outstanding. Thus, presently Maryland permits (but does not require) use of 118 milliliter bottles for bottling and sale intrastate. Use of that bottle size after January 1, 1980 is, however, prohibited in Maryland and elsewhere by 27 C.F.R. § 201.540b.[12]

## LEGAL QUESTIONS

The primary issue posed in these cases is whether the federal government may, pursuant to the taxing power in the Federal Constitution, establish an exclusive list of bottle sizes and prohibit the use of all other bottle sizes even when the bottling and sale take place intrastate, and even when the state involved affirmatively desires to permit the use of one additional bottle size not included within the federal list. Plaintiffs do not claim that the federal government may not *tax* the sale of the 118 milliliter bottles. Rather, plaintiffs claim that when the state desires to permit the bottling and sale of 118 milliliter bottles, within and only within that state's borders, the federal government may not prohibit such use.

The core of plaintiffs' argument is that section 2 of the Twenty-first Amendment prohibits the federal government, acting pursuant to the taxing power, from preventing the use of certain bottle sizes when the liquor is bottled solely for intrastate sale. There is little authority relating to the question of whether the Twenty-first Amendment restricts the exercise by the Congress of the taxing power. By way of contrast, it is to be noted that federal regulations, resting in part upon the commerce power, have been held to violate the Twenty-first Amendment when they conflict with state regulations. *Wine Industry of Florida, Inc. v. Miller*, 609 F.2d 1167 (5th Cir. 1980); *Castlewood International Corporation v. Simon*, 596 F.2d 638 (5th Cir. 1979).[13]

**12.** Overbrook and Heublein argue that 27 C.F.R. § 201.540b prohibits the use only of quarter-pint bottles, and not of 118 milliliter bottles, for intrastate purposes. That argument is not tenable. The clear language of 27 C.F.R. § 201.540b discloses that the list of permissible sizes therein is exclusive. There is no exception for 118 milliliter bottles. It is true that 27 C.F.R. § 5.47(a) does not prohibit the intrastate use of 118 milliliter bottles or, for that matter, of quarter-pint bottles. Quarter-pint bottles are not on the list in 27 C.F.R. § 5.47(a), which pertains to interstate and foreign commerce and not intrastate commerce. However, 27 C.F.R. § 201.540(b) forbids the intrastate use of quarter-pint, and/or 118 milliliter bottles. Thus, pursuant to 27 C.F.R. § 5.47(a), the use of quarter-pint and 118 milliliter bottles is prohibited in interstate and foreign commerce; pursuant to 27 C.F.R. § 201.540b, the use of such bottles is prohibited for all domestic purposes, including intrastate use, after January 1, 1980. The two regulations are consistent with each other: they apply the same bottle sizes to foreign, interstate and intrastate commerce, pursuant to different federal enactments and regulations.

**13.** The challenged federal regulations in *Wine Industry* and *Castlewood* were both promulgated pursuant to 27 U.S.C. § 205(b), part of the FAA Act. Section 205(b) reads as follows:

§ 205. Unfair competition and unlawful practices.

It shall be unlawful for any person engaged in business as a distiller, brewer, rectifier, blender, or other producer, or as an importer or wholesaler, of distilled spirits, wine, or malt beverages, or as a bottler, or warehouseman and bottler, or distilled spirits, directly or indirectly or through an affiliate:

(b) "Tied house". To induce through any of the following means, any retailer, engaged in the sale of distilled spirits, wine, or malt beverages, to purchase any such products from such person to the exclusion in whole or in part of distilled spirits, wine, or malt beverages sold or offered for sale by other persons in *interstate or foreign commerce*, if such inducement is made in the course of *interstate or foreign commerce*, or if such person engages in the practice of using such means, or any of them, to such an extent as substantially *to restrain or prevent transactions in interstate or foreign commerce* in any such products, or if the direct effect of such inducement is to prevent, deter, hinder, or restrict other persons from selling or offering for sale any such products to such retailer in *interstate or foreign commerce*: (1) By acquiring or holding (after the expiration of any existing license) any interest in any license with respect to the premises of the retailer; or (2) by acquiring any interest in real or personal property owned, occupied, or used by the retailer in the conduct of his business; or (3) by furnishing, giving, renting, lending, or selling to the retailer, any equipment, fixtures, signs, supplies, money services, or other thing of value, subject to such exceptions as the Secretary of the Treasury shall by regulation prescribe, having due regard for public health, the quantity and

In both *Castlewood* and *Wine Industry*, the Florida statutory provisions therein involved permitted but did not require certain intrastate conduct prohibited by the federal regulation. *Wine Industry* at 1172. The same is true in the within cases in which Maryland permits but does not require the use of the 118 milliliter bottle prohibited by federal regulation. *Castlewood, Wine Industry* and the within cases are to be contrasted with cases in which the state action *restricts* liquor transactions within the state which the federal action would permit.

In *Castlewood*, a federal regulation and a Florida statute were in conflict because the federal regulation effectually created a floor below which wholesale prices could not go even though prices below that level were "acceptable under the Florida scheme * * *." *Id.* at 641. Judge Fay, in opting for the Florida policy, wrote:

> Liquor occupies a unique position among items of commerce insofar as the Commerce Clause is concerned. Its unique position is due to [section two of] the Twenty-first Amendment * * *.
>
> * * * * * *
>
> * * * We must proceed from a vantage point of presumed state power and then ask whether there are any limitations to that power, always keeping in mind that where intoxicating liquors are concerned, great deference must be accorded a comprehensive state regulatory scheme. [*Id.* at 641–42]
>
> * * * * * *
>
> Federal laws have prevailed over state regulation of intoxicating liquors in only two circumstances: 1) where the state regulation was repugnant to overriding national concern with due process and equal protection, and 2) where the state has sought to invade an area of exclusive federal concern, such as federally owned installations, regulation of commerce with foreign nations, and taxation of imports from foreign countries. Thus, absent a strong federal interest, the state scheme must prevail. * * * [*Id.* at 643; footnotes omitted.]

In *Wine Industry*, the Fifth Circuit again dealt with a conflict between a federal regulation and a Florida statutory provision, this time with regard to whether certain servicing by Florida distributors of Florida retailers was permissible. Again, the Fifth Circuit opted for Florida. In so doing, Judge Kravitch wrote (at 1170):

> Section two of the Twenty-first Amendment is hardly an often-litigated provision of the Constitution. There is, however, a small body of case law which has evolved around it. Typically, litigated cases under the Twenty-first Amendment involve state laws which are more restrictive than federal law. Indeed, the purpose of the Amendment was to permit "dry" states to regulate, to the point of exclusion, the flow of alcohol across their borders. [Citations omitted.] Accordingly, the Twenty-first Amendment protects a state which chooses to impose a burden on the sale of alcohol which would be impermissible under the Commerce Clause if the item burdened was not alcohol. [Citations omitted.]
>
> This case presents what is essentially the inverse of the typical Twenty-first

---

value of articles involved, established trade customs not contrary to the public interest and the purposes of this subsection; or (4) by paying or crediting the retailer for any advertising, display, or distribution service; or (5) by guaranteeing any loan or the repayment of any financial obligation of the retailer; or (6) by extending to the retailer credit for a period in excess of the credit period usual and customary to the industry for the particular class of transactions, as ascertained by the Secretary of the Treasury and prescribed by regulations by him; or (7) by requiring the retailer to take and dispose of a certain quota of any of such products; * * *. [Emphases added.]

Thus, it appears that that statutory provision was passed pursuant to the Congress' commerce power. *See* n. 8, *supra.* It also is to be noted that the Fifth Circuit panels in both *Wine Industry* and *Castlewood* treated the challenged federal regulations as though they had been promulgated pursuant to the commerce power exclusively. *See* 609 F.2d at 1170; 596 F.2d at 641.

Amendment case;[14] here the Federal government has placed a burden on commerce in alcohol which the state wishes to avoid. Analogous challenges were made to application of the Emergency Price Control Act of 1942 to the sale of liquor. In those cases, however, the contention was made that the Federal government is completely prohibited from legislating in the area of alcoholic beverages by the Twenty-first Amendment. Such challenges failed, but there did not appear to be any countervailing state legislation involved. *Old Monastery Co. v. United States*, 147 F.2d 905 (4th Cir.), *cert. denied*, 326 U.S. 734, 66 S.Ct. 44, 90 L.Ed. 437 (1945); *Jatros v. Bowles*, 143 F.2d 453 (6th Cir. 1944).

As indicated by the above quotations, *Wine Industry* and *Castlewood* both stressed the special nature of a state's power with regard to the handling of liquor within its borders and the impact of the Twenty-first Amendment upon the Commerce Clause. That Amendment has often been held to insulate state action from invalidation as violative of the commerce clause. In *State Board of Equalization v. Young's Market Co.*, 299 U.S. 59, 62, 57 S.Ct. 77, 78, 81 L.Ed. 38 (1936), Mr. Justice Brandeis held valid as authorized by the Twenty-first Amendment a California license fee for the privilege of importing beer brewed out of state, which "[p]rior to [that] Amendment * * * would obviously have been unconstitutional * * * [as] a direct burden on interstate commerce * * *." *See Indianapolis Brewing Co. v. Liquor Control Commission*, 305 U.S. 391, 394, 59 S.Ct. 254, 255, 83 L.Ed. 243 (1939), in which Mr. Justice Brandeis held that Michigan, pursuant to the Twenty-first Amendment, could prohibit sale in Michigan of beer brewed in another state if that state discriminated against the sale of beer brewed in Michigan within such second state's borders; *Carter v. Virginia*, 321 U.S. 131, 64 S.Ct. 464, 88 L.Ed. 605 (1944), in which Mr. Justice Reed, speaking for a majority of the Court, held that Virginia could

validly regulate liquor shipped from one state to another state through Virginia under its police power without offending the commerce clause, and in which Mr. Justice Frankfurter concurred only because of his perception of the effect of the Twenty-first Amendment.

Subsequently, in *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964), Mr. Justice Stewart, for a majority of the Court, held that despite New York State's power under the Twenty-first Amendment to "regulate or control the passage of intoxicants through her territory in the interest of preventing their unlawful diversion into the internal commerce of the State," *id.* at 333, 84 S.Ct. at 1299, it could not "prevent transactions carried on under the aegis of a law passed by Congress in the exercise of its explicit power under the Constitution to regulate commerce with foreign nations," *id.* at 334, 84 S.Ct. at 1299. The transactions involved in *Hostetter* were supervised by the federal Bureau of Customs and involved sales at Idlewild Airport of liquor "not delivered to the customer until he arrives at his foreign destination," *id.* at 325, 84 S.Ct. at 1294. In writing for the majority, Mr. Justice Stewart noted: "This Court made clear in the early years following adoption of the Twenty-first Amendment that by virtue of its provisions a State is totally unconfined by traditional Commerce Clause limitations when it *restricts* the importation of intoxicants destined for use, distribution, or consumption within its borders." *Id.* at 330, 84 S.Ct. at 1297 (emphasis added). Then, after citing to and reviewing a group of the Court's earlier opinions, the Justice wrote (*id.* at 331–32, 84 S.Ct. at 1298):

To draw a conclusion from this line of decisions that the Twenty-first Amendment has somehow operated to "repeal" the Commerce Clause wherever regulation of intoxicating liquors is concerned would, however, be an absurd oversimplification. If the Commerce Clause had been *pro tanto* "repealed," then Congress

---

14. As indicated *supra*, the within cases also present that inverse question.

would be left with no regulatory power over interstate or foreign commerce in intoxicating liquor. * * *

Both the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution. Like other provisions of the Constitution, each must be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case.

*Joseph E. Seagram & Sons v. Hostetter*, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966), involved certain New York State liquor police statutory provisions. Writing therein, Mr. Justice Stewart commented upon his earlier decision as follows (*id.* at 42–43, 86 S.Ct. at 1259, 1260):

Unlike *Idlewild*, the present case concerns liquor destined for use, distribution, or consumption in the State of New York. In that situation, the Twenty-first Amendment demands wide latitude for regulation by the State. We need not now decide whether the mode of liquor regulation chosen by a State in such circumstances could ever constitute so grave an interference with a company's operations elsewhere as to make the regulation invalid under the Commerce Clause. * * It will be time enough to assess the alleged extraterritorial effects of [the New York statute] when a case arises that clearly presents them. * * *

In addition, *see Craig v. Boren*, 429 U.S. 190, 206, 97 S.Ct. 451, 461, 50 L.Ed.2d 397 (1976); *Heublein, Inc. v. South Carolina Tax Comm'n*, 409 U.S. 275, 283, 93 S.Ct. 483, 488, 34 L.Ed.2d 472 (1972); *Vintage Imports, Ltd. v. Joseph E. Seagram & Sons, Inc.*, 409 F.Supp. 497, 506–07 (E.D.Va.1976); *National Railroad Passenger Corp. v. Miller*, 358 F.Supp. 1321, 1327 *et seq.* (D.Kan.) (three-judge court), *aff'd mem.*, 414 U.S. 948, 94 S.Ct. 285, 38 L.Ed.2d 205 (1973); *Epstein v. Lordi*, 261 F.Supp. 921, 931, *et seq.* (D.N.J.1966) (three-judge court), *aff'd mem.*, 389 U.S. 29, 88 S.Ct. 106, 19 L.Ed.2d

29 (1967). *Cf. McCormick & Co. v. Brown*, 286 U.S. 131, 140–41, 52 S.Ct. 522, 525–26, 76 L.Ed. 1017 (1932), in which Mr. Chief Justice Hughes, construing the Eighteenth Amendment and certain federal and state statutory provisions, held that, prior to the enactment of the Twenty-first Amendment, West Virginia could require nonresident manufacturers and wholesale dealers to pay for and obtain licenses before shipping certain products into the state.[15]

In a number of cases, the Twenty-first Amendment has *not* prevented invalidation of state laws or actions, when the state actions were challenged as violative of provisions of the federal Constitution other than the commerce clause or as inconsistent with federal laws enacted pursuant to constitutional powers other than those set forth in the commerce clause. In *Craig v. Boren, supra*, Oklahoma statutory provisions prohibiting sale of 3.2% beer to males younger than 21 years and to females younger than 18 were invalidated as gender-based discrimination against males in violation of equal protection principles. Mr. Justice Brennan rejected the contention that the Twenty-first Amendment protected the challenged Oklahoma statutes from such equal protection attack and wrote (429 U.S. at 206, 97 S.Ct. at 461): "This Court's decisions * * * have confirmed that the [Twenty-first] Amendment primarily created an exception to the normal operation of the Commerce Clause. [Citations omitted.] * * * Once passing beyond consideration of the Commerce Clause, the relevance of the Twenty-first Amendment to other constitutional provisions becomes increasingly doubtful." In addition, *see Department of Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341, 84 S.Ct. 1247, 12 L.Ed.2d 362 (1964) (re Export-Import Clause); *Women's Liberation Union of Rhode Island v. Israel*, 512 F.2d 106, 107 (1st Cir. 1975). In *Women's Liberation Union*, the First Circuit held

---

**15.** In *McCormick*, the Chief Justice emphasized the importance of certain pre-Eighteenth Amendment federal statutory provisions. 286 U.S. at 140–41, 52 S.Ct. at 525–26. In *Craig v. Boren*, 429 U.S. at 205–06, 97 S.Ct. at 461, Mr.

Justice Brennan stated that the Twenty-first Amendment was intended to "constitutionaliz[e] the Commerce Clause framework established under those statutes."

that a Rhode Island liquor license classification violated equal protection principles in a sex discrimination context. In that case, Judge Coffin wrote (at 108):

Appellants contend that the district court, in finding the classification established by § 3–8–5 not rationally related to a legitimate state purpose, too narrowly construed the regulatory powers reserved to the states by the Twenty-first Amendment to the Constitution. The Supreme Court in *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), approved a regulation prohibiting the presentation in bars of sexually explicit entertainment, some aspects of which the Court conceded would have been protected by the First Amendment in another context. The Court reviewed the cases in which it had recognized the Twenty-first Amendment as ". . . conferring something more than the normal state authority over public health, welfare, and morals", 409 U.S. at 114, 93 S.Ct. at 395 and noted that "[t]hese decisions did not go so far as to hold or say that the Twenty-first Amendment supersedes all other provisions of the United States Constitution in the area of liquor regulations." *Id.* at 115, 93 S.Ct. at 395. The Court concluded that in the light of powerful evidence that prostitution, rape, and assault on police officers proliferated in and around bars presenting sexually explicit entertainment, the state's determination that such entertainment should be prohibited in establishments licensed to serve intoxicating beverages was not "irrational". *Id.* at 116, 93 S.Ct. 390. *LaRue*, while it reiterates the proposition long embraced by the Court that the states have broad powers to regulate the sale of liquor, does not release the states from the requirement that the objective of the regulation be permissible, and that the means selected be rationally related to the end to be achieved.[16]

In *Craig v. Boren, supra*, Mr. Justice Brennan wrote of *LaRue* as follows (at 207, 97 S.Ct. at 462):

It is true that *California v. LaRue*, 409 U.S. 109, 115, 93 S.Ct. 390, 395, 34 L.Ed.2d 342 (1972), relied upon the Twenty-first Amendment to "strengthen" the State's authority to regulate live entertainment at establishments licensed to dispense liquor, at least when the performances "partake more of gross sexuality than of communication," *id.*, at 118, 93 S.Ct. at 397. Nevertheless, the Court has never recognized sufficient "strength" in the Amendment to defeat an otherwise established claim of invidious discrimination in violation of the Equal Protection Clause.

In *Old Monastery Co. v. United States*, 147 F.2d 905 (4th Cir.), *cert. denied*, 326 U.S. 734, 66 S.Ct. 44, 90 L.Ed. 437 (1945), and also in *Jatros v. Bowles*, 143 F.2d 453 (6th Cir. 1944), both of which are cited *supra* at p. 164 in the quotation from *Wine Industry*, the challenged federal actions were apparently upheld entirely or in large part because of the applicability of the war power. In *Jatros* (at 455), Judge Simons stated that "[n]either expressly nor by implication was the war power abrogated or limited by the Twenty-first Amendment."[17]

---

16. *And see Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), in which in the course of holding a Wisconsin statute regulating sale or gifts of liquor invalid as violative of procedural due process, Mr. Justice Douglas wrote (at 436, 91 S.Ct. at 509):

We have no doubt as to the power of a State to deal with the evils described in the Act. The police power of the States over intoxicating liquors was extremely broad even prior to the Twenty-first Amendment.
* * *

17. Writing in *Old Monastery* (at 907), Judge Dobie stressed the following comments in *Jat-*ros which are seemingly relevant with regard to the commerce clause itself:

Equally strong are the words of Circuit Judge Simons in *Jatros v. Bowles*, 6 Cir., 143 F.2d 453, 455: "Followed to its logical conclusion, the appellant's construction, if valid, would mean that the federal government no longer has power to punish theft of intoxicants from interstate shipments of alcoholic beverages under the authority of the so-called Car Seal Act, nor to regulate or prohibit unfair trade practices in respect to such commodities through the Federal Trade Commission, nor to regulate tariffs through or-

*Arrow Distilleries v. Alexander*, 109 F.2d 397 (7th Cir.), *cert. denied*, 310 U.S. 646, 60 S.Ct. 1095, 84 L.Ed. 1412 (1940), involved a proceeding by the Federal Alcohol Administration (FAA) to suspend permits of a company (a) for selling misbranded products in interstate commerce, (b) for so doing without prior FAA approval of labels, and (c) for falsifying "certain records required to be kept under internal revenue laws and regulations." *Id.* at 400. Judge Treanor, in affirming the administrative order, wrote (at 400–01):

> Petitioner argues that the twenty-first amendment has transferred to the states "complete and · exclusive control over commerce and traffic in intoxicating beverages unlimited by the commerce clause" and has deprived Congress of its power under the Constitution to enact the present statute as a regulation of interstate commerce in intoxicating liquors.
>
> Section 2 of the twenty-first amendment gives effect to any and all state laws prohibiting the transportation or importation of intoxicating liquors into a state in violation of the laws thereof. But there is no provision in the amendment which purports to restrict the power of Congress over commerce in intoxicating liquors when such commerce is carried on without the violation of state laws, or to deny to Congress the power to legislate in aid of the state prohibitions. * * *
>
> We are of the opinion that the enactment of the Federal Alcohol Administration Act was a valid exercise by Congress of its constitutional powers to regulate interstate and foreign commerce and *to protect the revenue* * * *. It is not necessary that the Act as a whole rest upon a single power of Congress; and

according to the language of Sec. 3 of the Act (27 U.S.C.A. § 203) Congress was exercising its power *to protect the revenue* derived from distilled spirits, wine, and malt beverages, to regulate interstate and foreign commerce, to enforce the postal laws in respect thereto, and to enforce the twenty-first amendment.

> * * * The power to regulate production of intoxicating liquors for the purpose of protecting revenue is not detracted from by the twenty-first amendment, but is, in fact, supplemented thereby. Under the twenty-first amendment Congress may authorize regulations affecting production for the purpose of making effective the protection which the twenty-first amendment gives to the states even though such regulations may not contribute to the protection of the revenue.
>
> Petitioner urges that the Act seeks to regulate purely intrastate transactions through the device of granting permits which cover all the production activities which ordinarily are considered intrastate * * *. Whether the provisions of the Act requiring one to receive a permit before engaging in the operations of rectifying, distilling, and bottling would be invalid as applied to one who engages in those operations solely and strictly for purposes of intrastate trade need not be considered in deciding this case since petitioner admittedly is engaged in interstate commerce. Petitioner owns and operates its plant in Illinois where it receives shipments of distilled spirits which are distilled outside the state of Illinois and which petitioner rectifies, blends and warehouses and bottles for transportation and wholesale to customers outside of Illinois. [Footnotes omitted; emphases added.] [18]

ders of the Interstate Commerce Commission, nor to prohibit unfair labor practices affecting commerce in intoxicants by brewers or distillers under the authority of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., nor to prescribe minimum wages or maximum hours for employees in such enterprises under the authority of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. *These implications demonstrate the tenuous-*

*ness of the appellant's broad contentions."* [Italics in original.]

18. In *Hanf v. United States*, 235 F.2d 710 (8th Cir.) *cert. denied*, 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 81 (1956), defendant challenged his conviction for failing to keep and file proper records of his activities as a liquor wholesaler on the ground that "[w]hile the persons and firms from whom he purchased distilled spirits

In the within cases, as opposed to the situation in *Arrow Distilleries*, the ultimate sales of bottled liquor are only to customers within, not outside of, Maryland. But the bottling within Maryland of liquor produced in Connecticut and shipped to Maryland prior to bottling involves interstate activity which is relevant to the collection of the revenue by the federal authorities. Thus, in these cases, as in *Arrow Distilleries*, it is unnecessary to reach the question of whether the taxing power can be exercised with respect to what are *entirely* intrastate transactions.

■ The issue posed in these cases does not involve the invalidation of any state action, whether because of conflict with federal action or otherwise. What *is* involved herein is the validity of a federal prohibition against doing something the state desires to permit. Even assuming, *arguendo* only, that if that federal prohibition were grounded on the exercise of the commerce power, it would violate the state's authority under the Twenty-first Amendment, there is no authority for holding that that Amendment restricts the otherwise valid exercise of the taxing power by the federal government to prevent something a state desires to permit.[19]

■ That brings us to plaintiffs' further contentions that 27 C.F.R. § 201.540b, as a tax regulation, is invalid because it will be of no assistance in collecting liquor taxes, that it bears no reasonable relation to the protection of the revenue, and that there is therefore no statutory authority for its promulgation.

The burden on a party seeking to invalidate a tax regulation as unreasonable is a heavy one. A court

> do[es] not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task

of prescribing "all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U.S.C. § 7805(a). In this area of limitless factual variations, "it is the province of Congress and the Commissioner, not the courts, to make the appropriate adjustments." [Citation omitted.] The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner. * *

*United States v. Correll*, 389 U.S. 299, 306–07, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967). In *Noble Motor Company v. United States*, 231 F.Supp. 702, 708 (D.Md.1964), Judge Winter, then a district judge, wrote that "[o]ne who insists that a [tax] regulation is invalid ' * * * must make its invalidity so manifest that the court has no choice except to hold that the Secretary has exceeded his authority and employed means that are not at all appropriate to the end specified in the act of Congress,' * * *."

The burden is particularly heavy where, as here, the statutory authority for the regulation and the regulation itself have been in existence since 1934, and where the statutory authority for the regulation has been reenacted by Congress. In *United States v. Correll, supra* 389 U.S. at 305–06, 88 S.Ct. at 449, Mr. Justice Stewart, in speaking of a tax regulation, quoted an earlier tax case for the

> settled principle that "Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law." [Citation omitted.]

*See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1974).

---

were engaged in interstate commerce, his purchases from them were made entirely within the State of Minnesota and his sales were only to buyers within the State of Minnesota." *Id.* at 716. The Eighth Circuit upheld the constitutionality of the federal statute involved, in the

face of the defendant's attacks under the Twenty-first Amendment and otherwise.

19. It is to be noted that no challenge is made herein to the procedure pursuant to which the federal regulations at issue were promulgated.

In *Felsenheld v. United States*, 186 U.S. 126, 22 S.Ct. 740, 46 L.Ed. 1085 (1902), the Supreme Court dealt with the power of the federal government to promulgate regulations under the taxing power. Plaintiff in *Felsenheld* challenged a regulation issued by the Commissioner of Internal Revenue which forbade the inclusion of anything other than tobacco in a tobacco package. Plaintiff wished to include a coupon in its packages. The coupon was weightless, and thus its inclusion could "not affect, in any way, the ascertaining of the proper tax payable upon the package or interfere in any way with the collection of such tax." *Id.* at 131, 22 S.Ct. at 742. Nevertheless, the coupons came within the purview of the prohibition of the regulation, and their inclusion in the packages was forbidden by it. In upholding the validity of the regulation, Mr. Justice Brenner spoke as follows (*id.* at 131–33, 22 S.Ct. at 742–743):

> In the internal revenue legislation Congress has not simply prescribed that certain articles shall pay a tax, but has provided a series of rules and regulations for the manufacture and sale of such articles, including therein directions as to the size and form of packages, and such other matters as in its best judgment were necessary or advisable for the purposes of effectually securing the payment of the tax imposed. Now the contention is that the courts may supervise this system of rules and regulations, and if they find a provision which, in their judgment, in no way secures or facilitates the proper collection of the tax they may strike it down as something beyond the power of Congress. It is said that the only matter in which the national government is concerned is the tax * * *.

> \* \* \* \* \* \*

> It seems to us that, in the rules and regulations for the manufacture and handling of goods which are subjected to an internal revenue tax, Congress may prescribe any rule or regulation which is not in itself unreasonable * * *. Congress may rightfully make the prohibition [against inclusion of items other than tobacco in tobacco packages] absolute and the courts may not draw a line between the foreign substance, which is trifling in size and weight, and that which is of appreciable size and weight, and hold in reference to a particular package the act valid if the size or weight is appreciable and invalid if it is not.

> Among the regulations prescribed by Congress in its internal revenue legislation are many which are purely arbitrary, or at least the necessity of which for the collection of taxes is not apparent. For instance, Congress has directed (Rev.Stat. 3392) that cigars shall be put up in boxes containing twenty-five, fifty, one hundred, two hundred and fifty, or five hundred each. There is no special efficacy in either [sic] of these numbers. Boxes containing fifteen, thirty, or sixty cigars would apparently afford just the same facilities for taxation, and yet can there be a doubt that Congress may make such a rule and compel each manufacturer to abide thereby? It has a right to select, and when it has made a selection, although there may be no special reasons for the specific numbers, and they are in fact arbitrarily selected, it may for purposes of uniformity compel compliance with the rule. So, if it should prescribe that at least nine tenths of every package, purporting to be a package of a particular kind of tobacco, and subject to a special tax, should be that particular kind of tobacco, would the manufacturer be permitted to make one third of the contents of some other kind of tobacco or any other substance? The proportion might be arbitrarily selected, it is true, but is it not clearly within the power of Congress in its regulations to make such arbitrary selection? And if it may say that not less than nine tenths of the contents shall be that particular tobacco, the subject of the tax, is it any the less within the power of Congress to prescribe that there shall be nothing in the package save that tobacco?

> Indeed, the admission that the Government may require that the contents of a package shall be partly of the goods

which it taxes is a concession that it may also require the entire contents to be such goods.

In the within cases, defendants do not argue that the use of certain sizes protects the revenue while the use of others would not. Rather, defendants indicate that restriction of standards of fill to certain sizes will "ensure that legal liquor bottles are easily recognizable by their sizes, brandings, and markings. * * * [T]he Treasury Department * * * continues to believe, that in order to protect the revenue, it is necessary to have a limited number of consistent and uniform sizes." [20]

Plaintiffs contend that, since the tax is applied to proof gallons of liquor prior to the liquor being placed in individual bottles, the regulation of bottle sizes bears no reasonable relationship to the protection of the revenue. The Secretary, however, has determined that the regulation of bottle sizes will assist him in protecting the revenue. Beginning January 1, 1980, liquor is to be taxed either in bulk or in the bottle, and not just in bulk as it was immediately prior to that date. "As of January 1, 1980, * * the Secretary's regulation of liquor containers will also protect the revenue by facilitating accurate tax computation." Defendants' Memorandum at 17. Thus, if liquor is bottled only in bottles of specific sizes, that will assist the Government in calculating and checking the tax due upon liquor in the bottle, even though the tax rate will still apply to proof gallons.[21]

Additionally, it is to be noted that if the challenged regulation is invalid because the tax is determinable before the liquor is bottled, then 26 U.S.C. § 5301(c) would be invalid as applied to tax-paid liquor. That section contains a federal prohibition against placing in liquor bottles "any distilled spirits whatsoever other than those contained in such bottle at the time of stamping." If plaintiffs' said approach is correct, it would require the conclusion that the reach of 26 U.S.C. § 5301(c) would need to be restricted to distilled spirits upon which no tax had yet been paid. Such placing of tax-paid liquor in bottles could then not be forbidden under the taxing power because the revenue would not be endangered by such conduct. However, all courts which have spoken on the subject since the amendment of 26 U.S.C. § 5301(c) in 1958 have concluded that 26 U.S.C. § 5301(c) applies to *all* liquor, whether tax has been paid on it or not. *See Watts v. United States*, 352 F.2d 803 (9th Cir. 1965); *Stilinovic v. United States*, 336 F.2d 862 (8th Cir. 1964). In those two cases, the application of the statute to tax-paid liquor, as well as to non-tax-paid liquor, was upheld. In *Stilinovic*, the Court (at 864) relied in part upon *Felsenheld v. United States*, 186 U.S. 126, 22 S.Ct. 740, 46 L.Ed. 1085 (1902).[22]

**20.** Defendants' Memorandum of Law in Support of Motion for Judgment on Agreed Statement of Facts, at 25, filed December 26, 1979. During a hearing in these cases on January 14, 1980, this Court asked counsel for the State of Maryland the following question: "Suppose * * * today you were asking not for just one additional size bottle but for a thousand different sized bottles. * * * The legal issue would be exactly the same, wouldn't it?" Counsel responded that the legal issue would be the same. This Court then asked: "If the federal government had to deal with one thousand more different sized bottles, it would make it more difficult to check back [for proper tax payments], wouldn't it?" Counsel responded: "I have to concede that." Counsel then argued that in these cases the parties seek authorization to use only one additional bottle size, and not one thousand, and that the use of only one additional bottle size could not substantially jeopardize the protection of the reve-

nue. However, the fact that these cases involve only one additional bottle size is not determinative. As counsel stated, the same legal argument would apply were the plaintiffs seeking to use one thousand additional bottle sizes, and not just one: if this Court were to permit the use of 118 milliliter bottles in these cases, the reasons for so doing could be equally applicable in future cases in which other plaintiffs sought to use one or more additional bottle sizes.

**21.** *See* the Distilled Spirits Tax Revision Act of 1979, Title VIII of P.L. 96–39, 96th Cong., 1st Sess.

**22.** In *Hanf v. United States*, 235 F.2d 710, 719 (8th Cir.), *cert. denied*, 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 81 (1956), the Eighth Circuit noted that it had earlier "held that a[n earlier version of 26 U.S.C. § 5301(c)] regulating the

Defendants' challenge herein is also mounted upon the argument that what is involved is regulation of commerce disguised as taxation. It is true that regulations designed to facilitate collection of taxes and to protect the revenue may often have an effect upon commerce. The within cases do not involve a situation in which a tax was adopted primarily for the purpose of regulation, but rather a situation in which a regulation was adopted for the purpose of protecting the revenue and facilitating the collection of taxes. The fact that a particular federal action which rests upon the taxing power affects commerce creates in and of itself no constitutional or other problem.[23]

■ Moreover, even if a tax is adopted in order to regulate, which is hardly the situation herein, "a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed." *United States v. Sanchez*, 340 U.S. 42, 44, 71 S.Ct. 108, 110, 95 L.Ed. 47 (1950). *See also United States v. United States Industrial Alcohol Co.*, 103 F.2d 97, 100 (4th Cir. 1939).

Whether this Court, if it were the Congress, or if it were the Secretary of the Treasury acting pursuant to powers bestowed upon him by the Congress, would enact legislation or promulgate a tax regulation outlawing the size bottle which plaintiffs, for reasons quite understandable from their point of view, desire to utilize is of no import whatsoever. This Court is not empowered to set aside the regulation attacked by plaintiffs herein once it determines, as it has *supra*, that that regulation passes muster despite the Twenty-first Amendment, and once this Court also determines that that regulation is reasonably related to the collection of the revenue. Plaintiffs' within challenge should be directed to the Secretary and/or to the Congress. Either has the discretionary power to withdraw or amend the challenged regulation. By contrast, this Court does not possess such power.

For the reasons set forth *supra*, judgment will be entered for defendants.[24]

## ON MOTIONS FOR INJUNCTION PENDING APPEAL

■ On February 29, 1980, this Court filed an opinion in these cases denying plaintiffs' quests for injunctive and other relief and entering judgment for defendants. Subsequently, all plaintiffs have noted appeals to the United States Court of Appeals for the Fourth Circuit. These cases are now before this Court on plaintiffs' motions seeking injunctions pending appeal pursuant to Federal Civil Rule 62(c).[1]

---

refill of liquor bottles was reasonably related to the protection of the revenue * * *."

**23.** *See Hanf v. United States*, 235 F.2d 710, 718–19 (8th Cir.), *cert. denied*, 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 81 (1956): "The control of intrastate liquor business by the federal government is not unique. There are many familiar examples of incidental control of certain activities normally beyond Congressional reach. [Citations omitted.] The power to regulate interstate commerce is not the only ground for sustaining the constitutionality of the Federal Alcohol Administration Act." The other ground in *Hanf* was the taxing power.

**24.** Plaintiffs in Civil No. K–79–2164 have indicated that they will be irreparably harmed if this Court permits the challenged federal regulation to take effect and if thereafter the Fourth Circuit and/or the Supreme Court grants to plaintiffs the relief which this Court holds herein plaintiffs are not entitled to obtain. Accordingly, the effect of the within opinion and of the Order being entered today in accordance therewith shall be stayed until March 4, 1980 to enable plaintiffs to file a motion to stay under Federal Civil Rule 62(c). If plaintiffs so do, that stay shall further continue in effect until this Court grants or denies the said Rule 62(c) motion. If plaintiffs file such a motion on or before March 4, 1980, defendants shall respond and plaintiffs shall rebut in accordance with the time provisions of Local Rule 6.

**1.** Federal Civil Rule 62(c) provides, in pertinent part:

When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party. * * *

Rule 8(a) of the Rules of Appellate Procedure provides, in pertinent part, as follows:

Application for a stay of the judgment or order of a district court pending appeal, or

The standards which govern in connection with such motions are set forth by Judge Winter in *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970).

Briefly stated, a party seeking a stay must show (1) that he will likely prevail on the merits of the appeal, (2) that he will suffer irreparable injury if the stay is denied, (3) that other parties will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay.

The combination of Federal Civil Rule 62(c) and Rule of Appellate Procedure 8(a) imposes, in the first instance, upon the district court the duty of deciding whether to grant or deny a stay pending appeal. In *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co., Inc.*, 550 F.2d 189, 193–94 (4th Cir. 1977), the Fourth Circuit reversed the trial court's refusal to grant a preliminary injunction under Federal Civil Rule 65(a). In so doing, Judge Craven wrote:

The cases relied upon by the district court deal with the question of the issuance *vel non* of an *appellate* stay pending review of an administrative order or a trial court decision that dealt with the merits of a controversy. Hence they propound an *appellate* standard—and not one for use in the trial courts.

\* \* \* \* \* \*

Likewise, *Long v. Robinson*, 432 F.2d 977 (4 Cir. 1970), another "strong showing" case from this circuit, involved a stay-pending-appeal situation, in which the district court had *fully considered the merits of the controversy*, rendered its final decree, and refused the request for an interim stay. Judge Winter explained in *Long* that the petitioner's burden in seeking injunctive relief is substantially greater on appeal. \* \* \*

Therefore, the district court erred in guiding itself by an appellate standard inappropriate at the trial level. [Footnote omitted; emphases in original.]

Herein, the four segments set forth by Judge Winter in *Long* require both separate and combined analyses.

### 1. *Likelihood of Success*

The likelihood-of-success standard does not mean that the trial court needs to change its mind or develop serious doubts concerning the correctness of its decision in order to grant a stay pending appeal. Thus, in *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843–45 (D.C.Cir.1977), Judge Leventhal wrote:

Implicit in the Commission's argument against the stay is the view \* \* \* that a lesser showing, of, say, a chance of prevailing that is only fifty percent or less is insufficient even though the "balance of equities," as determined by a consideration of the other three factors, clearly favors a stay.

\* \* \* [W]e decline to entertain this assumption. Instead, we hold that \* \* \* a court, when confronted with a case in which the other three factors strongly favor interim relief may exercise its discretion to grant a stay if the movant has made a substantial case on the merits. The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant a stay even though its own approach may be contrary to movant's view of the merits. The necessary "level" or "degree" of possibility of success will vary according to the court's assessment of the other factors.

\* \* \* \* \* \*

\* \* \* Prior recourse to the initial decision-maker would hardly be required as a general matter if it could properly grant interim relief only on a prediction that it has rendered an erroneous decision. What is fairly contemplated is that tribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when

for approval of a supersedeas bond, or for an order suspending, modifying, restoring or granting an injunction during the pendency

of an appeal must ordinarily be made in the first instance in the district court. \* \* \*

the equities of the case suggest that the status quo should be maintained.

In *Evans v. Buchanan*, 435 F.Supp. 832, 843–44 (D.Del.1977), Judge Schwartz wrote:

* * * *Strong Showing on the Merits*

According to the test accepted by virtually all courts, including this one, one seeking a stay pending appeal on disposition of writ of certiorari must make "a strong showing that he is likely to succeed on the merits of the appeal." *Reserve Mining Co. v. United States, supra* [8 Cir.], 498 F.2d [1073] at 1076. Although this standard is similar to one of the tests for issuance of a preliminary injunction, the posture of a case is significantly different when preliminary injunctive relief is sought from when a stay is requested. In the former, the Court has not ruled on the merits of the case and need only make an initial determination of the reasonable probability of the applicant's eventual success. [Citation omitted]. In the latter, the Court has issued its determination, after a full consideration of the merits. The above-quoted standard would seem to require that a district court confess to having erred in its ruling before issuing a stay.

     *    *    *    *    *    *

* * * It seems illogical * * * to require that the court in effect conclude that its original decision in the matter was wrong before a stay can be issued. Rather, a stay may be appropriate in a case where the threat of irreparable injury to the applicant is immediate and substantial, the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear and the interests of the other parties and the public are not harmed substantially. This is not to say, however, that every time a case presents difficult questions of law a stay should be entered. As noted earlier, the four factors must be viewed together and the interest of the movant balanced against the interests of the other parties and the public. It is the duty of the court to exercise its discretion so that an equitable resolution is achieved. * * * [Footnotes omitted].

The contentions advanced by plaintiffs prior to the filing by this Court of its opinion on February 29, 1980, are discussed in that opinion. Some of those same contentions are repeated in motions and memoranda filed in support of the presently pending quests of plaintiffs for stays pending appeal. Additionally, plaintiffs have embellished some of their original contentions and have argued that the effect of *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, —— U.S. ——, 100 S.Ct. 937, 63 L.Ed.2d 233, decided by the Supreme Court of the United States on March 3, 1980, is in their favor. In that case, Mr. Justice Powell, writing for a unanimous Court,[2] held that California's resale price maintenance and price posting statutes for the wholesale wine trade were invalid because in conflict with the Sherman Act, and that the California standard was not protected from invalidation by section 2 of the Twenty-first Amendment. Mr. Justice Powell, at ——, 100 S.Ct. at 944, characterized that section of the Twenty-first Amendment as "reserv[ing] to the States certain power to regulate traffic in liquor," and noted that the issue in *Midcal* was whether section 2 of the Twenty-first Amendment "permits California to countermand the congressional policy—adopted under the commerce power—in favor of competition" (at ——, 100 S.Ct. at 944). The Justice further noted that the "control [given to the states by the Twenty-first Amendment] logically entails considerable regulatory power not strictly limited to importing and transporting alcohol." At ——, 100 S.Ct. at 944. After examining a number of prior Supreme Court decisions, Mr. Justice Powell concluded that "[s]ubsequent decisions have given 'wide latitude' to state liquor regulation, *Seagram & Sons v. Hostetter*, 384 U.S. 35, 42 [86 S.Ct. 1254, 1259, 16 L.Ed.2d 336] (1966), but they have also stressed that important federal interests in liquor matters survived the ratifica-

---

**2.** Mr. Justice Brennan did not participate in the decision.

tion of the Twenty-First Amendment." —— U.S. at ——, 100 S.Ct. at 945. The Justice then briefly cited and discussed *Department of Revenue v. James Beam Co.*, 377 U.S. 341, 84 S.Ct. 1247, 12 L.Ed.2d 362 (1964); *Craig v. Boren*, 429 U.S. 190, 204–09, 97 S.Ct. 451, 460–63, 50 L.Ed.2d 397 (1976), and *Wisconsin v. Constantineau*, 400 U.S. 433, 436, 91 S.Ct. 507, 509, 27 L.Ed.2d 515 (1970), all of which are discussed in some detail in this Court's opinion filed February 29, 1980. The Justice, after stating that (—— U.S. at ——, 100 S.Ct. at 945): "[m]ore difficult to define, however, is the extent to which Congress can regulate liquor under its interstate commerce power," concluded (At ——, 100 S.Ct. at 946):

> These decisions demonstrate that there is no bright line between federal and state powers over liquor. The Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system. Although States retain substantial discretion to establish other liquor regulations, those controls may be subject to the federal commerce power in appropriate situations. The competing state and federal interests can be reconciled only after careful scrutiny of those concerns in a "concrete case." *Hostetter v. Idlewild Liquor Corp.*, 377 U.S. [324] at 332 [84 S.Ct. 1293 at 1298, 12 L.Ed.2d 350].

Mr. Justice Powell ended his opinion as follows (—— U.S. at ——, 100 S.Ct. at 948):

> We need not consider whether the legitimate state interests in temperance and the protection of small retailers ever could prevail against the undoubted federal interest in a competitive economy. The unsubstantiated state concerns put forward in this case simply are not of the same stature as the goals of the Sherman Act.

In this case, the federal interest in a viable system of taxation is a strong one, seemingly at least as strong as the federal interest in promoting competition to which the Supreme Court gave precedence in *Midcal.* Thus, even if the second section of the Twenty-first Amendment is applicable when the federal power involved is the taxing power and not the commerce power, which this Court very much doubts, *Midcal* teaches that the Twenty-first Amendment is to be applied on a careful balancing basis when state action conflicts with the exercise by the federal government of a power or powers granted to it by the federal Constitution. In any event, to date, the Twenty-first Amendment has not been utilized to invalidate or restrict federal exercise of the taxing power.

█  Plaintiffs assert that this Court did not "reach the question of whether the taxing power can be exercised with respect to what are *entirely* intrastate transactions." At 168; emphasis in original. Plaintiffs do not contend that the federal government may not tax the sale of 118 milliliter (quarter-pint) bottles within Maryland. Herein the purpose of the challenged regulation is purportedly to permit the more efficient administration of that federal taxing power. While the regulation does not itself impose a tax, it was promulgated to aid the efficient collection of liquor taxes. The above-quoted comment of this Court was made after lengthy quotations from *Arrow Distilleries v. Alexander*, 109 F.2d 397 (7th Cir.), *cert. denied*, 310 U.S. 646, 60 S.Ct. 1095, 84 L.Ed. 1412 (1940), in which was discussion of interstate vs. intrastate activities. Also, after that comment, this Court concluded (at 168; footnote omitted):

> Even assuming, *arguendo* only, that if that federal prohibition were grounded on the exercise of the commerce power, it would violate the state's authority under the Twenty-first Amendment, there is no authority for holding that that Amendment restricts the otherwise valid exercise of the taxing power by the federal government to prevent something a state desires to permit.

So that any confusion will be totally eliminated, this Court, at this time, does explicitly "reach the question of whether the

taxing power can be exercised with respect to what are *entirely* intrastate transactions," (emphasis in original), and answers that question in the affirmative. In so doing, this Court notes the distinction between the exercise of the taxing power and the commerce power. Further, this Court would so conclude even if the challenged action of the state were restrictive rather than permissive.

However, despite this Court's strong belief as to the correctness of its views as set forth in its February 29, 1980 opinion, there is little doubt that at least some of the issues raised in these cases present serious questions of first impression. For that reason, this Court concludes that plaintiffs have met the burden imposed by the first of the four standards applicable herein.

### 2. Irreparable Injury to Plaintiffs

■ Mere economic injury is rarely, if ever, sufficient to warrant entry of a stay of judgment to protect a party against it, particularly if a remedy exists whereby any economic injury may be repaired. *See Long v. Robinson, supra* at 980–81; *Virginia Petroleum Jobbers Assn. v. Federal Power Commission*, 259 F.2d 921, 925 (D.C.Cir. 1958). However, "when the potential economic loss is so great as to threaten the existence of the moving party's business, then an injunction may be granted, even though the amount of direct financial harm readily is ascertainable." Wright and Miller, Federal Practice & Procedure § 2948 at 440. *See Washington Metropolitan Area Transit Commission v. Holiday Tours*, 559 F.2d at 843 & n.2.

Plaintiff Overbrook has alleged that it will be forced to go out of business if a stay is not granted. Such injury would be serious and seemingly irreparable, *i. e.*, without adequate remedy against the federal government, should plaintiffs ultimately prevail in these cases. Potential injury to the other plaintiffs would not seem to be so grave even though plaintiff Heublein may loose business and even though the State of Maryland may lose some tax revenue.[3]

### 3. Irreparable Injury to Defendants

The defendants in these cases agreed to postpone enforcing the challenged regulation with regard to Maryland's permitting the use of 118 milliliter (quarter-pint) bottles from January 1, 1980, the date the regulation was to go into effect, until 14 days after this Court's entry of judgment on February 29, 1980. Such postponement seemingly did not cause any irreparable injury to defendants.[4] Moreover, simply postponing enforcement of the federal regulation challenged herein seemingly will not prevent its successful enforcement elsewhere and will not materially affect, in the long run, the institution of a nationwide taxing regulatory system if this Court's judgment is upheld on appeal. At a hearing held on the motion for stays on the record in open Court on April 16, 1980, counsel for the government candidly indicated that the postponement of the enforcement of the federal regulation challenged herein would not materially injure the defendants.

### 4. The Public Interest

The public interest lies marginally against the grant of a stay pending appeal

---

3. The federal government contends that some, if not all, of the problems plaintiffs encounter at this time have been caused by plaintiffs' own failure to take advantage of ATF invitations to comment, etc. on the challenged regulation prior to its promulgation and/or to commence this litigation at earlier dates. In *Long v. Robinson, supra* at 981, delays by the moving party were a factor in Judge Winter's decision to deny a stay pending appeal. However, while plaintiffs' written and oral presentations to this Court contain assertions of facts relating to such alleged delays, defendants explain the same on other bases. The record does not enable this Court to resolve the different em-

phases and positions of the parties in those regards. In any event, even assuming, *arguendo*, that plaintiffs have been guilty of some unjustifiable delays in these cases, the existence of such delays, although a factor which must be weighed against plaintiffs, does not, when considered together with all of the other facts in these cases, alter the overall balance in favor of plaintiffs.

4. By way of contrast, in *Long v. Robinson, supra* at 981, the prevailing plaintiffs in the trial court would have been irreparably damaged if the stay pending appeal had been granted.

since the interests of the greatest number of persons may be better served by allowing the federal government to implement its system of taxing liquor. However, the stay sought herein would only involve what can be expected to be a short delay in such implementation and such delay can hardly be of great general import. On the other hand, while the temporary unavailability of quarter-pint bottles, even if a number of persons prefer their use, would in itself hardly seriously harm the public interest, the general community as well as Overbrook would suffer a loss if Overbrook were to close down. On balance, the public interest factors do not appear to pull strongly in one direction or the other.

### Conclusion

■■■ The burden on those seeking an injunction pending appeal is a heavy one—much heavier than when an interlocutory injunction is sought in the trial court before the trial court has entered judgment. *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co.*, 550 F.2d at 194. The issues adjudicated in these cases are to some extent issues of first impression. If a stay is not granted, Overbrook may well go out of business. No irreparable injury to defendants will result if a stay pending appeal is granted. The public interest will not be seriously affected by the grant or the denial of a stay. On balance, all the plaintiffs have met their burden under the first standard and Overbrook has met its burden under the second standard. The State and Heublein get the benefit thereof. The record does not establish any reason under the third and fourth standards for the requested stays pending appeal to be denied. In *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co., Inc., supra* at 196, Judge Craven wrote the following concerning preliminary injunctions:

Thus in this circuit the trial court standard for interlocutory injunctive relief is the balance-of-hardship test. Whenever a district court has before it a Rule 65(a) motion, although it may properly consider the four general factors enumerated in *Airport [Commission of Forsyth Co., N.C. v. CAB*, 296 F.2d 95 (4th Cir. 1961)], it should give them the relative emphasis required by the *Sinclair [Refining Co. v. Midland Oil Co.*, 55 F.2d 42 (4th Cir. 1932)] rule: The two more important factors are those of probable irreparable injury to plaintiff without a decree and of likely harm to the defendant with a decree. If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success. Always, of course, the public interest should be considered.

Here the district court erroneously required *a strong showing of success* as a prerequisite to relief. [Emphasis in original.]

The Fourth Circuit has seemingly not specifically used "balancing" language in applying the four standards to determinations of quests for stays pending appeal. But there is no reason to believe that such "balancing" is not appropriate in that latter context as well as in the interlocutory context. For the reasons stated *supra*, the application of the "balancing" approach favors plaintiffs. Accordingly, a stay order will today issue for the benefit of all plaintiffs herein.[5]

---

5. At the above-mentioned April 16, 1980 hearing, counsel for plaintiffs agreed to comply with as reasonably fast briefing and oral argument schedules as the government desires and as the Fourth Circuit establishes. The parties have already fully briefed the legal issues in the course of their presentations to this Court. Thus, all counsel should be able to submit briefs and prepare for oral argument on a rapid basis.