Peter **MAMULA, et al., Plaintiffs,**

v.

**SATRALLOY, INC., Defendant.**

George **STARLIPER, et al., Plaintiffs,**

v.

**SATRALLOY, INC., Defendant.**

**Nos. C–2–83–0258, C–2–83–0259.**

United States District Court,
S.D. Ohio, E.D.

Sept. 7, 1983.

On Motion For Stay Pending Appeal
Jan. 18, 1984.

Patrick S. Cassidy and Timothy F. Cogan, Wheeling, W.Va., William T. Payne and Daniel P. McIntyre, Pittsburgh, Pa., for plaintiffs, Peter Mamula, et al.

Mark Stern, New York City, Thomas E. Palmer and R. Dean Jollay, Jr., Columbus, Ohio, for defendant, Satrolloy, Inc.

## MEMORANDUM AND ORDER

HOLSCHUH, District Judge.

This case is before the Court on the plaintiffs' motions for a preliminary injunction and to certify a class and defendant's motion to dismiss or, in the alternative, for summary judgment.

On February 9, 1983, the plaintiffs filed the present action against the defendant and moved the Court for a temporary restraining order and preliminary injunction. On February 23, 1983, the defendant responded to the plaintiffs' request for a temporary restraining order by filing a motion to dismiss or, in the alternative, for summary judgment. This Court denied the plaintiffs' request for a temporary restraining order on February 28, 1983, and scheduled this action for a trial on the merits on March 22, 1983. The Court did not address the defendant's motion to dismiss or, in the alternative, for summary judgment at the time it ruled on the plaintiffs' request for a temporary restraining order.

Subsequent to this Court's order of February 28, 1983, a dispute arose about whether this action should be certified as a class action. This Court concluded that in light of the parties' inability to agree to a certification of a class the trial on the merits of this case should be deferred until the certification issue could be resolved. Accordingly, this Court notified the parties that a trial on the merits would be set for a later date and that the hearing set for March 22, 1983, would deal with the three motions before the Court. At the March 22, 1983, hearing this Court formally rescinded the portion of the order entered in this case on February 28, 1983, that had consolidated the trial on the merits with the hearing on the plaintiffs' request for a preliminary injunction.

The Court has decided the three pending motions on the basis of the evidence presented at the full evidentiary hearing on March 22, 1983, the pleadings, and the affidavits and exhibits submitted by the parties.

In accord with Rule 65 of the Fed.R. Civ.P., the Court makes the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

Plaintiff George Starliper is an employee of defendant with twenty-three years of service who is currently on sick leave. Plaintiffs Sherley Mayle and Howard Walters have been employed by defendant for twenty-four years and were laid off effective December 31, 1982. Plaintiff Peter Mamula is sixty-three years of age and retired from defendant's employ on August 1, 1981. Plaintiff Joseph Swinsinski is sixty-four years old and retired on September 1, 1981.

Defendant Satralloy, Inc., a subsidiary of Satra Corporation, is a corporation doing business in the State of Ohio. It owns and has operated a ferro-alloy plant in Steubenville, Ohio. Defendant is engaged in an industry affecting commerce within the

meaning of sections 3(5), (11), (12), and (14) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1002(5), (11), (12), and (14) and the Labor Management Relations Act of 1947, 29 U.S.C. § 141 *et seq.* The parent corporation, Satra, is not a party to this action.

The Group Insurance Plan established and maintained by Satralloy is an "employee welfare benefit plan," "employee benefit plan," and a "plan" within the meaning of sections 3(1), (3) and 502 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1002(1), (3) and 1132.

Plaintiffs George Starliper, Sherley Mayle, and Howard Walters are designated beneficiaries of the employee benefit plan and as such are beneficiaries of the plan within the meaning of sections 3(8) and 502 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1002(8) and 1132. Plaintiffs Peter Mamula and Joseph Swinsinski are designated beneficiaries of the employee benefit plan and as such are beneficiaries of the plan within the meaning of sections 3(8) and 502 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1002(8) and 1132.

Satralloy, the defendant, established and maintained, as a single employer, the employee benefit plan and as such is the administrator and plan sponsor within the meaning of section 3(16)(A) and (B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1002(16)(A) and (B). The plan was instituted pursuant to collectively bargained agreements between Satralloy and the United Steelworkers of America (hereinafter "the union") on behalf of the production and maintenance (hereinafter "P & M") and clerical and laboratory (hereinafter "C & L") employees.

Under the terms of the plan eligible laid-off employees, retirees, employees on leaves, surviving spouses and dependents are entitled to certain insurance coverage, which varies according to the length of service and the type of benefit.

Satralloy made the premium payments for the group health insurance coverage under the plan until December of 1982. Satralloy's group insurance coverage with Blue Cross was terminated effective December 1, 1982, and with Prudential effective January 1, 1983, as a result of the company's failure to make premium payments. No further payments have been made to date. Satralloy's employees and retirees were given the opportunity to convert, at their own expense, their group coverage to individual insurance policies with no lapse in coverage. The defendant does not contest its obligation to make the premium payments, costing approximately $32,000 per month, to maintain coverage under the group insurance plan with Blue Cross and Prudential. The company's only stated reason for its failure to make the premium payments is its alleged financial inability resulting from the recession in the ferrochrome industry.

Satralloy closed the Steubenville facility on December 31, 1982, and to the Court's knowledge it has not been reopened, although defendant asserts it has plans to resume operation in the near future.

Some of the participants did exercise the opportunity to convert their group coverage to an individual policy. In several respects, however, the individual policies might afford less comprehensive coverage than under the group insurance plan. Furthermore, those participants who converted did so at their own expense, that is, they now pay the premiums for their individual policies. Other participants were unable to take advantage of the opportunity to convert because of the prohibitive expense of the individual policies.

## II. CONCLUSIONS OF LAW

Jurisdiction exists in this Court under section 502 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132. Jurisdiction further exists under section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185.

The plaintiffs, beneficiaries in the employee welfare benefit plan, are not required to exhaust any grievance procedure because, under the facts of this case, resort to the grievance procedure would be futile

in light of defendant's admission of its obligation to make the group insurance premium payments.

The union is not a necessary party to this action between the beneficiaries-participants of the employee benefit plan and the plan administrator-sponsor.

The requirements of Fed.R.Civ.P. 23(a) and 23(b)(2) have been satisfied and, therefore, this action is properly certified as a class action.

The anti-injunction provisions of the Norris-LaGuardia Act (sections 1, 4 and 7, 29 U.S.C. §§ 101, 104, 107) do not prohibit this Court from exercising its power to grant injunctive relief under section 502 of ERISA, 29 U.S.C. § 1132.

The defendant's admission of its obligation to make the premium payments creates a substantial likelihood that plaintiffs will prevail on the merits.

Irreparable harm to the plaintiffs exists in this case by virtue of the type of injury involved coupled with the defendant's precarious financial condition. If the plaintiffs were to prevail on the merits, their remedy at law would be inadequate.

As a result of the irreparable injury that the plaintiffs would suffer in the absence of injunctive relief and the inadequacy of any remedy at law, a denial of their motion for a preliminary injunction will cause far greater harm to the plaintiffs than the harm that would be suffered by the defendant upon the granting of a preliminary injunction.

In light of the plaintiffs' status as beneficiaries of an employee benefit plan that was established to provide them with health care protection and defendant's obligation to maintain that plan, the public interest is better served by the issuance of the preliminary injunction than by its denial.

## III. DISCUSSION

A. DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

■ The defendant, Satralloy, makes two arguments to support its motion to dismiss or, in the alternative, for summary judgment. First, it argues that the group insurance plan payments arise from the collective bargaining agreements and that plaintiffs' claims concerning defendant's failure to make those payments is subject to the contractually specified grievance procedure, one that culminates in arbitration. Unquestionably the plaintiffs have chosen not to process their claim through the grievance procedure. Defendant insists that plaintiffs' failure to exhaust the steps available in the grievance procedure causes their claim to fail. *Vaca v. Sipes*, 386 U.S. 171, 184–87, 87 S.Ct. 903, 913–15, 17 L.Ed.2d 842 (1967) (exhaustion requirement in § 301 LMRA cases); *Amato v. Bernard*, 618 F.2d 559, 566–69 (9th Cir. 1980) (exhaustion requirement in § 502 ERISA cases).

It is not necessary for this Court to decide whether the claims of the laid-off employees and the retirees in this case are subject to the collectively bargained for grievance procedure. Assuming, *arguendo*, that the claims of both the laid-off employees and the retirees constitute "requests or complaints" subject to the grievance procedure, exhaustion of that procedure is not required in this case. In *Amato v. Bernard*, 618 F.2d 559 (9th Cir.1980), a case in which the Ninth Circuit Court of Appeals expressed cogent reasons for requiring the application of the exhaustion requirement in ERISA cases, the Court went on to state,

> [w]e recognize of course that despite the usual applicability of the exhaustion requirement, there are occasions when a court is obliged to exercise its jurisdiction and is guilty of an abuse of discretion if it does not, the most familiar examples perhaps being when resort to the administrative route is futile or the remedy inadequate.

*Amato*, 618 F.2d at 568 (citation omitted).

In this case, exhaustion of the grievance procedure would be futile because the defendant has unequivocally admitted its obli-

gation to make the premium payments for the group insurance coverage. Mr. Louis A. DiPaolo is the Plant Manager and Controller and as such is responsible for the financial dealings of the plant. He testified at the March 22, 1983, evidentiary hearing as follows:

### ON DIRECT EXAMINATION

Q. Mr. DiPaolo, what is the monthly amount of the health insurance premium payments to Blue Cross and Prudential?

A. Approximately $32,000 a month.

Q. Does the company have the funds to make that payment currently?

A. No, we don't.

Q. Would the company pay that obligation if it could?

A. Yes, we would.

### ON CROSS EXAMINATION

Q. Now, Mr. DiPaolo, you heard Mr. Walters' testimony about a meeting with Carl Longley. Were you present?

A. Yes, I was.

Q. And do you remember there being some discussion about a grievance, and, "If you want to file a grievance, you win." Do you remember that kind of discussion?

A. Well, it was similar to that, I mean, I don't know the exact words, but *we've contended from the beginning that we aren't contesting our obligation, our financial responsibility in this matter.*

Q. *So, there's really no dispute here, is there?*

A. *No, there's no dispute. It's a matter that the funds are not available in order to make these payments.*

### ON REDIRECT EXAMINATION

THE COURT: As I understand your testimony in response to counsels' questions, Mr. DiPaolo, you feel there is no dispute here with the employees or the union. The company recognizes an ob-

ligation under the collective bargaining agreements to provide the coverage, but simply financially cannot do so; is that a correct statement?

THE WITNESS: Yes, your Honor.

(Transcript of Proceedings, March 22, 1983, pp. 81–82, 92–93 and 107) (emphasis added). To require the plaintiffs to exhaust the available grievance procedures in light of this evidence would be to require the performance of a needless act and would be an abuse of this Court's discretion.

■ Defendant's second argument in support of its motion to dismiss or, in the alternative, for summary judgment is that the union is a necessary party to this action and plaintiffs' failure to join the union must result in a dismissal of their action. Even though the defendant apparently dropped this argument by the time it filed its Prehearing Memorandum, a brief discussion of the argument is appropriate in light of defendant's assertion of this argument in its earlier motion to dismiss. In that motion Satralloy insists that "[c]learly, the union's absence subjects the defendant to '. . . a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of [the union's] claimed interest.' This is particularly true since the grievance procedure remains an available forum." For several reasons defendant's position must be rejected. First, this Court has ruled that the grievance procedure need not be exhausted in this case, so that it does not remain "an available forum." Thus, any union interest in the conduct of the grievance procedure is absent here.

Second, in the language quoted above from the defendant's motion, which in turn quotes from Fed.R.Civ.P. 19(a)(2)(ii), the defendant implies that the union has claimed an interest in this litigation under subpart (2) of Rule 19(a). In fact, the union has not claimed any interest in the instant case. Furthermore, in the absence of either any claimed interest by the union or the requirement of an exhaustion of grievance procedures, the defendant has not demonstrated how it might be "subject to a substantial risk of incurring double, multiple,

or otherwise inconsistent obligations...." The cases upon which defendant relies are inapposite. For example, in *Hodgson v. School Board, New Kensington-Arnold School District,* 56 F.R.D. 393 (W.D.Pa. 1972), an action by the United States under the Equal Pay Act of 1963, the court specifically pointed out that its conclusion that the union was a necessary party was based on its finding that the case involved a "potential for altering and restructuring the compensation provisions of the collective bargaining agreement" between the defendant School Board and the union resulting in a possibility of later action by the union against the School Board. In the instant action little potential, if any, exists for a restructuring of the collective bargaining agreements; the plaintiffs are not challenging any provision of the agreements and, instead, are simply seeking to enforce provisions of the agreement under which defendant has admitted its obligation. Under these circumstances, the possibility of later action by the union is remote.

Third, the defendant has failed to indicate, pursuant to Rule 19(a)(1), and the Court sees no reason, why in the union's absence "complete relief cannot be accorded to those already parties." Section 502 of ERISA, 29 U.S.C. § 1132, specifically empowers beneficiaries to bring civil actions for various purposes, including "to enjoin any act or practice which violates ... the terms of the plan." In this case the beneficiaries are clearly the parties in interest and complete relief can be accorded to them in the absence of the union. *Cf. Carpenters & Millwrights Health Benefit Trust Fund v. Domestic Insulation Co.,* 387 F.Supp. 144 (D.Colo.1975). (In § 301 action the union signatories to the collective bargaining agreements were not necessary parties and need not be joined when plaintiff trustees of various Trust Funds seek judgment ordering defendant employer to comply with provisions of the trust agreements.)

The two bases supporting defendant's motion—plaintiffs' failure to exhaust their remedy under the grievance procedure and plaintiffs' failure to join a necessary party—are without merit. Therefore, defendant's motion to dismiss or, in the alternative, for summary judgment is DENIED.

## B. PLAINTIFFS' MOTION TO CERTIFY A CLASS

■ The plaintiffs have moved this Court "to certify this matter as a class action and to constitute and define the appropriate class as all persons who are eligible for insurance coverage under the insurance plan and collective bargaining agreements as alleged in these cases, and all persons who will become so eligible for insurance benefits under the plan and collective bargaining agreements as alleged in these cases, as well as pensioners, their dependents, surviving spouses receiving surviving spouses pension benefits, and their eligible dependents who are eligible for insurance coverage under the insurance plan or collective bargaining agreements named in these cases, or who will become so eligible for insurance benefits."

The party seeking to certify a class has the burden to establish his right to do so. "As a preliminary matter, he must satisfy all four of the prerequisites contained in Rule 23(a) and then demonstrate that the class he seeks to represent falls within one of the subcategories of Rule 23(b)." *Senter v. General Motors Corp.,* 532 F.2d 511, 522 (6th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976) (citations and footnotes omitted).

### 1. *The Requirements of Rule 23(a)*

Rule 23(a) provides as follows:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

The plaintiffs have alleged that the proposed class consists of approximately 320

persons. Defendant asserts that there were 160 laid-off employees, retired employees, employees on leaves, surviving spouses, and dependents enrolled in the group health insurance plan when the defendant terminated its insurance premium payments. Defendant, however, does not dispute that the numerosity requirement of Rule 23(a)(1) is satisfied here. Whether the ultimate number of class members is determined to be 160 or 320 or somewhere in between the Court finds that the proposed class is so numerous that joinder of all members is impracticable; yet, the class members are capable of identification and the size of the class is not so large as to make the action incapable of judicial resolution. 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.05[1] (2d ed. 1982) (hereinafter "Moore").

Defendant asserts that plaintiffs' motion must fail under Rule 23(a)(2) for want of common questions of fact. In support, defendant points out that the eligibility of each person under the group insurance plan depends on his status—that is, whether he is a laid-off employee, an employee on disability, a retired employee, a surviving spouse or a dependent—and other factors, primarily his length of service. In essence, defendant is arguing that the proposed class should not be certified because the Court would first have to make individual determinations concerning each proposed class member to determine his eligibility. This Court cannot agree. First, the defendant has misconstrued Rule 23(a).

> In keeping with the liberal construction to be given the rule, it has been held that the class does not have to be so ascertainable that every potential member can be identified at the commencement of the action.... On the other hand, the general outlines of the membership of the class must be determinable at the outset of the litigation.

7 C. Wright & A. Miller, *Federal Practice and Procedure*, § 1760 at 580 (1972) (citations omitted) (hereinafter Wright & Miller). Here, in fact, more than a general outline of the class is determinable; defendant's records of persons eligible under the plan at the time of termination—numbering at least 160 by defendant's own estimation—identifies the core group of class members. Certainly as the plan is maintained certain persons may become eligible or ineligible thereby requiring their addition to or deletion from the class membership. The requirements for eligibility under the plan, however, are sufficiently discernable and definite that it will be "administratively feasible for the court to determine whether a particular individual is a member." Wright & Miller § 1760 (citations omitted). The application of the plan's precise standards for eligibility to determine future additional membership in the class is certainly less difficult in this case than the procedure for determination of class membership in a typical Title VII class action. *See Senter*, 532 F.2d at 523–24.

Second, the plaintiffs' claims arise solely from an act of the defendant—termination of the group insurance plans—directed toward all of the plaintiffs. As a result, the question of law presented in this case is common to all of the plaintiffs. Defendant does not dispute its obligation to make the insurance premium payments, pursuant to the collective bargaining agreements; therefore, the only questions of law presented are whether the defendant may refuse to make premium payments under the group insurance plan solely on the ground that it is insolvent and whether defendant's action is a breach of its fiduciary obligations under ERISA. These common questions of law satisfy the requirement of Rule 23(a)(2).

Because the typicality requirement of Rule 23(a)(3) has been equated with the coextensiveness of interests requirement of Rule 23(a)(4), both subdivisions will be discussed here. 3B Moore ¶ 23.06–2. The following four considerations should be taken into account in determining the adequacy of representation:

> (1) whether the interests of the named party are coextensive with the interests of other members of the class; (2) whether his interests are antagonistic in any

way to the interests of those whom he represents; (3) the proportion of those made parties as compared with the total membership of the class; (4) any other facts bearing on the ability of the named party to speak for the rest of the class.

3B Moore ¶ 23.07[1] (citations omitted).

First, the interests of the named plaintiffs are typical of or coextensive with the interests of the other members of the class. Of the five named plaintiffs, two are retired employees, two are laid-off employees with more than twenty years of service, and one was on disability leave at the time the employer terminated the group insurance plan. The interest of both the named plaintiffs and the other class members of the class is to have their group insurance coverage maintained rather than to be forced to purchase more expensive individual policies or rather than to have no insurance at all. Certainly, the scope of coverage under the plan varies with the person's status and length of service, but the problem of differing interests due to the varied scope of coverage might affect only the question of damages incurred during the time the defendant failed to maintain the plan. For the purposes of injunctive relief, however, the interests of all class members are identical. Subclasses can be formed or the class action can be otherwise modified, if necessary, at the time the Court must decide the question of damages. Fed.R.Civ.P. 23(c)(4); 7A Wright & Miller, §§ 1775, 1790.

Second, the defendant claims that because none of named plaintiffs has less than twenty years of service and because those class members with less than twenty years of service receive fewer benefits under the plan, those persons might prefer that defendant spend its available money for the purpose of reopening the facility rather than for payment of insurance premiums. This scenario of antagonistic interests rests, of course, upon the defendant's assertion that if the Court orders the defendant to make payments under the plan the defendant could be forced into bankruptcy and the facility might not reopen.

The defendant should not be permitted to create—by its own positing of a future hypothetical situation—a false antagonism among beneficiaries of the plan in order to prevent the Court from granting injunctive relief to all persons to whom the defendant has admitted its obligation. Thus, the court finds no adverse interests among the named plaintiffs and the other class members.

Third, the proportion of the named plaintiffs to the total membership of the class (that is, 5 of a minimum of 160 and a maximum of approximately 320) poses no problems for certification of the class. *See, e.g., Sweet v. General Tire & Rubber Co.,* 74 F.R.D. 333, 334 (N.D.Ohio 1976) (2 of 620).

The final element of adequacy of representation applicable here is that plaintiffs' counsel "must be qualified, experienced and generally able to conduct the proposed litigation." *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). The affidavit of plaintiffs' counsel satisfies the Court that this requirement has been demonstrated.

2. *The Requirement of Rule 23(b)(2)*

Fed.R.Civ.P. 23(b)(2) provides, as follows: An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

.        .        .        .        .

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole;

. . .

Although most suits brought under Rule 23(b)(2) involve constitutional or civil rights, the rule certainly is not limited to those subjects. 7A Wright & Miller, § 1775. This Rule has two prerequisites. First, "the challenged conduct or lack of conduct [must] be premised on a ground that is applicable to the entire class." 7A

Wright & Miller, § 1775. Second, "final injunctive or declaratory relief must be requested against the party opposing the class." 7A Wright & Miller § 1775 (citations omitted). These two requirements are analytically intertwined. "[C]lass-wide mandatory or prohibitory injunctive or declaratory relief, as distinguished from individual relief, which can correct the action or inaction of the defendant, would seem to require sufficient 'grounds generally applicable to the class' in order to satisfy the traditional equitable remedy policies that a decree be an effective, supervisable and useful exercise of judicial power." 3B Moore ¶ 23.40[2] (citations omitted). In this case, the action in question is the defendant's termination of the plan by its failure to make the premium payments, which it has admitted it is obligated to do. Defendant's action was directed to and affected the entire class. Individual relief would not be sufficient to correct defendant's failure to maintain the plan. Furthermore, plaintiffs have requested not only preliminary but also permanent injunctive relief. Their request for damages in addition to equitable relief does not prevent the maintenance of this action under Rule 23(b)(2). 7A Wright & Miller, § 1775. Therefore, this Court concludes that this action is proper under Rule 23(b)(2) because the defendant "has refused to act on grounds generally applicable to the class thereby making appropriate final injunctive relief ... with respect to the class as a whole." Rule 23(b)(2). For the foregoing reasons, this Court has determined that this action is particularly appropriate for maintenance as a class action.

### 3. *The Composition of the Class*

The composition of the class is a straightforward matter in this case. The Court has found that the defendant terminated the group insurance coverage with respect to the carrier Blue Cross effective December 1, 1982, and with respect to the carrier Prudential effective January 1, 1983. Therefore, the class is properly composed of the following persons: individuals who were eligible under the plan on November 30, 1982, as to Blue Cross' portion of the coverage and those eligible under the plan on December 31, 1982, as to Prudential's portion of the coverage, all those individuals who would have become eligible under the plan after the date of its termination had it not been terminated by the defendant, and those persons who are beneficiaries, under the plan, of the foregoing persons.

This Court has certified this action as a class action under Rule 23(b)(2), and, as such, notice to class members is not required under Rule 23(c)(2). The Court, however, has the power to require notice under Rule 23(d)(2). The Court hereby orders defendant Satralloy to give notice to the eligible persons under the group insurance plan. The notice shall fully inform them of the reinstatement of their coverage under the plan and the scope of that coverage.

For the reasons set forth herein, plaintiffs' motion to certify a class is GRANTED.

### C. PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

▮ Jurisdiction exists in this case under section 502 of ERISA, 29 U.S.C. § 1132, and under section 301 of LMRA, 29 U.S.C. § 185. Plaintiffs request relief under section 502(a)(3), 29 U.S.C. § 1132(a)(3), which authorizes beneficiaries of an employee welfare benefit plan to bring a civil action "(A) to enjoin any act or practice which violates ... the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce ... the terms of the plan."

### 1. *The Norris-LaGuardia Act and ERISA*

Defendant Satralloy asserts that the anti-injunction provisions of the Norris-LaGuardia Act, 29 U.S.C. §§ 101 *et seq.*, deprive this Court of jurisdiction to issue a preliminary injunction in this case. In particular defendant relies upon section 4, which provides in part as follows:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts: ... (c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value....

29 U.S.C. § 104.

In *Heheman v. E.W. Scripps Co.,* 661 F.2d 1115 (6th Cir.1981), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982), the Sixth Circuit Court of Appeals thoroughly discussed the history and present scope of the Norris-LaGuardia Act, as follows:

Though the Act was principally directed toward abuses of injunctions directed against union activities, *e.g., Boys Markets, Inc. v. Retail Clerks Union,* 398 U.S. 235, 250–51, 90 S.Ct. 1583, 1592, 26 L.Ed.2d 199 (1970), the terms of its broadest prohibitions do not distinguish between injunctions against labor and injunctions against management. The Court has recognized that as the labor movement has grown in power, congressional attention has shifted from protection of labor unions to encouragement of collective bargaining and other techniques for peaceful resolution of industrial disputes. *The shift has occurred without revision of such older statutes as the anti-injunction provisions of Norris-LaGuardia, thus throwing upon the courts the task of accommodating and reconciling older statutes with newer ones, among the latter § 301 of the Labor Management Relations Act. Id.*

The result has been the creation of narrow exceptions to the broad anti-injunction provisions of the Norris-LaGuardia Act, principally the grant of specific performance against management of grievance arbitration clauses, *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), and against unions of no-strike provisions, the *quid pro quo* of arbitration clauses. *Boys Markets, supra,* 398 U.S. at 248, 90 S.Ct. at 1591. In *Buffalo Forge Co. v. Steelworkers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), the Court, in refusing to extend the scope of *Boys Markets,* emphasized the continuing vitality of Norris-LaGuardia:

The driving force behind *Boys Markets* was to implement the strong congressional preference for the private dispute settlement mechanisms agreed upon by the parties. Only to that extent was it held necessary to accommodate § 4 of the Norris-LaGuardia Act to § 301 of the Labor Management Relations Act and to lift the former's ban against the issuance of injunctions in labor disputes.

.    .    .    .    .

[A]side from the enforcement of the arbitration provisions of such contracts, within the limits permitted by *Boys Markets,* the Court has never indicated that the courts may enjoin actual or threatened contract violations despite the Norris-LaGuardia Act. In the course of enacting the Taft-Hartley Act, Congress rejected the proposal that the Norris-LaGuardia Act's prohibition against labor-dispute injunctions be lifted to the extent necessary to make injunctive remedies available in federal courts for the purpose of enforcing collective-bargaining agreements.

428 U.S. at 407, 409, 96 S.Ct. at 3147, 3148. The Court has not moved beyond the specific areas arising in *Lincoln Mills* and *Boys Markets* in carving exceptions to the prohibitions of the Norris-LaGuardia Act. It has not treated the issue facing us here: whether specific performance of a collective employment contract is a remedy available to employees.

*Heheman*, 661 F.2d at 1124. After discussing two Court of Appeals cases from other circuits in which those courts granted preliminary injunctive relief "on the ground that the activity sought to be enjoined did not appear on the list of specifically enumerated prohibitions contained in the Norris-LaGuardia Act at 29 U.S.C. § 104," the *Heheman* court found that the activity involved there did fall within one of the enumerated prohibitions of section 4 and, therefore, denied injunctive relief. *Heheman*, 661 F.2d at 1124–25. In accord is *In re Crowe & Associates, Inc.*, 713 F.2d 211 at 212–213 (6th Cir.1983) (per curiam), in which the activity involved fell within section 4(a).

The instant case, however, differs from *Heheman* and *Crowe* in several important respects. First, the activity at issue here does not fall within any of the specifically enumerated subsections of section 4 (29 U.S.C. § 104). Although the defendant does not argue that any of the subsections of section 4 directly apply, it does quote subsection 4(c). That subsection, however, refers specifically to "strike or unemployment benefits or insurance, or other moneys or things of value...." The Ninth Circuit Court of Appeals held in *Retail Clerks Union Local 1222 v. Alfred M. Lewis, Inc.*, 327 F.2d 442, 448 (9th Cir.1964) that subsection 4(c) did not prohibit the Court from ordering the employer to comply with a provision in the collective bargaining agreement that provided for a cost of living wage adjustment. In this case, as in *Alfred M. Lewis*, the "moneys" to be paid do not relate to "strike or unemployment benefits or insurance." The insurance premium payments involved in this case are for health insurance and not for strike insurance or unemployment insurance and, therefore, are outside of the scope of subsection 4(c). F. Frankfurter & N. Greene, *The Labor Injunction* 103–04, 218 (reprint 1963). The authors, after quoting the Senate version of section 4(c), which was enacted in its present form with only grammatical changes, stated "[t]he meaning and merits of this provision require no commentary. What has been generally recognized as law is spelled out to avoid the recurrence of unwarranted features in at least two federal decrees in recent years.[36]" *Id.* at 218. Note 36 referred to two cases in which the following pertinent injunctive relief was issued or approved: *International Union, U.M.W. v. Red Jacket Consol. Coke & Coal Co.*, 18 F.2d 839, 842 (4th Cir.1927) (affirmed on appeal an injunction that, *inter alia*, restrained the union "from aiding or abetting any person or persons to occupy or hold without right, any house or houses or other property of the plaintiffs, or any of them, by sending money or other assistance to be used by such persons in furtherance of such unlawful occupancy or holding."); *United States v. Railway Employees' Dept.*, 286 F. 228 (N.D.Ill.1923). (The Court enjoined the union from "[u]sing or causing to be used, or consenting to the use of any of the funds or moneys of said labor organization in aid of or to promote or encourage the doing of any of the matters or things hereinbefore restrained or enjoined.") These injunctions were reprinted in the Senate Hearings on S. 1482 at pages 596 and 113, respectively. They indicate the type of injunctive relief that Congress sought to prohibit by enacting section 4(c).

As the Sixth Circuit Court of Appeals noted in *Heheman*, "congressional attention has shifted from protection of labor unions [in the Norris-LaGuardia Act] to encouragement of collective bargaining and other techniques for peaceful resolution of industrial disputes [in the Labor Management Relations Act]." *Heheman*, 661 F.2d at 1124. Even when this later gloss is placed on subsection 4(c), one cannot conclude that the subsection should be read so broadly as to include the health insurance premium payments involved in this case, because a court order requiring the defendant to make the premium payments, especially in light of defendant's admitted obligation to make the payments, would not derogate from the congressional policy of encouraging the "peaceful resolution of industrial disputes."

Thus, as the Ninth Circuit Court of Appeals recognized in *Alfred M. Lewis*, even though a "labor dispute" does exist in the technical denotative sense—the health insurance plan can be considered a term or condition of employment under subsection 13(c) of the Norris-LaGuardia Act, 29 U.S.C. § 113(c)—the employer's failure to make these payments is not the type of "labor dispute" to which the Act is aimed. *Alfred M. Lewis*, 327 F.2d at 448. *Cf. Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 458, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957) ("The kinds of acts which had given rise to abuse of the power to enjoin are listed in § 4. The failure to arbitrate was not a part and parcel of the abuses against which the Act was aimed.")

The second, and most critical, respect in which the instant case differs from both *Heheman* and *Crowe* is that jurisdiction is predicated here on section 502(a)(3) of ERISA. In *Laborers Fringe Benefit Funds—Detroit and Vicinity v. Northwest Concrete & Construction, Inc.*, 640 F.2d 1350 (6th Cir.1981), the Sixth Circuit Court of Appeals held "that section 502(a)(3) is unambiguous evidence of Congress' express intent to permit federal courts to issue injunctions." *Northwest Concrete*, 640 F.2d at 1352. *Northwest Concrete* involved an action under section 502(a)(3) of ERISA by the trustees of a Fringe Benefit Fund to recover unpaid contributions and to obtain a permanent injunction restraining the defendant employer from violating the fringe benefit provisions of its collective bargaining agreement with the union under which the employer was obligated to make periodic payments to the Fringe Benefits Fund. The sole question facing the Court in *Northwest Concrete* was "whether or not a fiduciary of an employee benefit plan can bring an action under ERISA to enjoin a recalcitrant employer from failing to comply with the benefit payment provisions of a labor agreement." *Northwest Concrete*, 640 F.2d at 1352. The Court first reviewed the declared policy of ERISA, which is as follows:

(b) *It is hereby declared to be the policy of this Act to protect ... the inter-* ests *of participants in employee benefit plans and their beneficiaries* ... by establishing standards of conduct, responsibility and obligation for fiduciaries of employee benefit plans, and *by providing for appropriate remedies, sanctions, and ready access to the Federal courts.*

Section 2(b), 29 U.S.C. § 1001(b) (emphasis added).

The Court then pointed out that the enforcement provisions, sections 501 and 502, were enacted to promote the stated policies of ERISA—the provision of "appropriate remedies, sanctions, and ready access to the Federal courts." "In this manner," the Court concluded after quoting section 502(a)(3), "Congress made it abundantly clear that an employer would not be permitted to circumvent or ignore its funding, *payment* and other obligations under ERISA." *Northwest Concrete*, 640 F.2d at 1352 (emphasis added).

In further support of the Court's interpretation of section 502(a)(3), the Court discussed that section's legislative history, as follows:

The legislative history underlying section 502 indicates that Congress intended that the enforcement provisions should have teeth: *the provisions should be liberally construed "to provide both the Secretary and participants and beneficiaries with broad remedies for redressing or preventing violations of the Act."* H.R. Rep. No. 93–533, 93d Cong., 2d Sess. 17, *reprinted in* [1974] U.S.Code Cong. & Ad.News, pp. 4639, 4655. This history further states that "[t]he intent of the Committee is to provide the full range of legal and equitable remedies available in both state and federal courts and to remove jurisdictional and procedural obstacles which in the past appear to have hampered effective enforcement of fiduciary responsibilities under state law for recovery of benefits due to participants." *Id.*

*Northwest Concrete*, 640 F.2d at 1352 (emphasis added).

In two other recent cases within the Sixth Circuit and one case within the Eighth Circuit, district courts in ERISA cases have issued injunctions requiring the employers to make contributions, pursuant to collective bargaining agreements, to funds providing health care insurance and other benefits to employees. *Van Drivers Union Local No. 392 v. Neal Moving & Storage,* 551 F.Supp. 429 (N.D.Ohio 1982); *Central States, Southeast and Southwest Areas Pension Fund v. Admiral Merchants Motor Freight, Inc.,* 511 F.Supp. 38 (D.Minn.1980), *aff'd,* 642 F.2d 1122 (8th Cir. 1981); *Central States, Southeast and Southwest Areas Pension and Health & Welfare Funds v. McNamara Motor Express Inc.,* 503 F.Supp. 96 (W.D.Mich.1980). In neither *Northwest Concrete* nor the three district court cases did the courts specifically discuss the question whether the anti-injunction provisions of the Norris-LaGuardia Act prevent federal courts from issuing injunctions under ERISA, particularly section 502, 29 U.S.C. § 1132. The Sixth Circuit Court of Appeals, however, thoroughly reviewed the policies underlying ERISA, the language of section 502, and its legislative history and unequivocally stated that "on the basis of the plain language of the statute and the attendant legislative history, *we hold that section 502(a)(3) is unambiguous evidence of Congress' express intent to permit federal courts to issue injunctions.* Therefore, the district court below had authority under section 502(a)(3) to enjoin the defendant's misconduct [its failure to make periodic payments to the Fringe Benefit Fund pursuant to the collective bargaining agreement]." *Northwest Concrete,* 640 F.2d at 1352–53 (footnote omitted) (emphasis added). This Court can only conclude that despite the absence of a specific statement in ERISA's legislative history and in the *Northwest Concrete* opinion that the anti-injunction provisions of the Norris-LaGuardia Act do not apply to actions brought under section 502 of ERISA, the clearly stated policy of ERISA in section 2(b), the literal language of section 502(a)(3), and that section's legislative history undoubted-

ly express Congress' intent to permit federal courts to issue injunctions as well as other appropriate equitable relief.

### 2. *The Prerequisites for Injunctive Relief*

■ Having concluded that the anti-injunction provisions of the Norris-LaGuardia Act do not prohibit this Court from issuing an injunction or other appropriate equitable relief under section 502(a)(3) of ERISA, the Court must still find that "the primary prerequisites for the issuance of [an] injunction" exist in this case. *Northwest Concrete,* 640 F.2d at 1353. In *Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977), the Sixth Circuit fully set out the following criteria upon which a preliminary injunction must be based:

1. Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

2. Whether the plaintiffs have shown irreparable injury;

3. Whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. Whether the public interest would be served by issuing a preliminary injunction.

First, this Court is convinced that plaintiffs have shown a substantial likelihood of prevailing on the merits. As discussed earlier, the defendant has unequivocally stated that it has not disputed or contested from the beginning its obligation to make the insurance premium payments under the plan, which has been incorporated into the collective bargaining agreement. There is no question that the defendant is not discharging its current obligations to make the premium payments under the plan, so that the defendant's breach of its obligation is ongoing.

Second, irreparable harm to the plaintiffs exists in this case as a result of the type of injury involved coupled with the defendant's admittedly precarious financial condition.

The injury to the plaintiffs, here, is not merely monetary. The plaintiffs are not now covered by the group insurance plan because of its termination by defendant. Despite the opportunity to convert their group coverage to individual policies, many of the plaintiffs were not able financially to afford to convert their policies or, at best, they were able to convert only part of the coverage. To presume that one not able to afford health insurance coverage is harmed only in a monetary sense is to ignore the realities of the situation. For example, plaintiff Joseph Swinsinski, in an affidavit and in his oral testimony stated that he is a retiree on a fixed retirement income who is in need of major surgery, according to his doctor, that the Satralloy group insurance plan would have covered the cost of the surgery, but that he had to cancel the surgery upon Satralloy's termination of the plan and that he is unable to afford the insurance that would cover the cost of the surgery. The adequacy of a monetary award to a person unable to afford health insurance coverage rests on the assumption that the person will seek and obtain necessary medical care, will pay for the medical care received at that time, and will simply be recompensed later by the defendant when a judgment is rendered against it.

Such an assumption could have some validity if the costs of medical services and hospitalization in today's society were well within the financial reach of the average worker. In reality, they are not. It is an unfortunate but true fact of life today that health care costs have skyrocketed to the point where health care insurance is virtually a necessity for persons of modest incomes if needed medical attention is to be obtained. Indeed, it is not unusual for a provider of major medical care—often the most needed care—to require evidence of insurance in advance of delivery of medical or hospital care. It is largely because health care costs have reached such heights that provisions in collective bargaining contracts requiring the employer to pay the cost of the premiums have become so important to employees and, as a result of increasingly higher premium costs, an ever larger financial burden to the employer. It is a utopian notion that all working men and women or retirees can well afford, without insurance, the cost of essential medical services today or that, if they cannot afford them, those services will always be provided to them. The harsh reality, as illustrated by Joseph Swinsinski, is that persons on limited incomes who are not covered by some form of medical insurance often forego needed medical attention because of its prohibitive cost. Being denied today's passport to the doctor's office and hospital—the health insurance card—which the employer promised under the collective bargaining agreement, results in harm that is not readily measurable but is clearly present. The ultimate effects of delay in obtaining medical attention or of not receiving any medical attention, or of purchasing inadequate coverage are all incapable of being easily measured. The harm, difficult to assess in monetary terms but real to the plaintiffs, cannot be adequately compensated by some judgment for damages awarded many months or even years after the termination of the plan occurred.

Additionally, even if one were to consider this type of harm adequately compensable at law when a defendant is clearly able to satisfy a judgment against it for damages, there is no indication in the present case that Satralloy will in the future be able to satisfy a monetary judgment in favor of the plaintiffs. The Sixth Circuit's recent decision in *Aluminum Workers Local Union No. 215 v. Consolidated Aluminum Corp.*, 696 F.2d 437 (6th Cir.1982) is pertinent to the effect of a defendant's financial condition in the context of injunctive relief for employees who have suffered damages as a result of a breach of a collective bargaining agreement. In *Consolidated Aluminum,* the District Court issued a preliminary injunction ordering the defendant employer to reinstate sixteen laid-off employees, who had been discharged allegedly in violation of the collective bargaining agreement. On appeal, the union argued, in support of the injunction, "that loss of employment constitutes irreparable

harm because awards of backpay and reinstatement, traditional remedies for such an injury, cannot fully compensate employees for the repossessions, foreclosures, and injury to credit stature which could accompany unemployment." *Consolidated Aluminum*, 696 F.2d at 443. The Sixth Circuit rejected this argument by stating,

> *[W]e disagree insofar as loss of employment is, as it is here, solely the result of job eliminations by a solvent employer. Absent some indication of action on the part of the employer which could jeopardize its ability to reinstate affected employees or to pay them wages for the period of unemployment,* we hold that loss of employment, even if occasioned by employer action which is subject to arbitration, is not irreparable harm and will not support a claim by the union for injunctive relief.

*Consolidated Aluminum*, 696 F.2d at 443.

In the instant case, Satralloy itself has emphasized its very precarious financial condition and its inability to satisfy any judgment at law, should plaintiffs prevail on the merits. In *Central States, Southeast and Southwest Areas Pension Fund v. Admiral Merchants Motor Freight, Inc.*, 511 F.Supp. 38 (D.Minn.1980), *aff'd*, 642 F.2d 1122 (8th Cir.1981), the plaintiffs, trustees of a Pension Fund and a Health & Welfare Fund, moved for a preliminary injunction under section 502(a)(3) of ERISA ordering defendant employers to make contributions to the fund in accordance with their obligations under the collective bargaining agreement. The District Court found that the plaintiffs clearly demonstrated that irreparable harm may result from a denial of injunctive relief. "As they have acknowledged, defendants both are in precarious financial condition. Consequently, it is possible that defendants would be unable to satisfy any judgment ultimately rendered by the court, particularly in light of the fact that the obligations of each increase by more than $15,000 per month." *Admiral Merchants*, 511 F.Supp. at 43. Defendant's hope or plan that, if the demand for ferrochrome increases, it might be able to resume operations and then,

after secured creditors are paid, it would resume making the group insurance premium payments is an insufficient basis for this Court to conclude that the defendant is likely to be able to satisfy any judgment ultimately rendered by the Court. For the foregoing reasons, this Court concludes that the plaintiffs have demonstrated irreparable injury will occur in the absence of injunctive relief.

Third, this Court finds that the balance of equities favors the plaintiffs, that is, that as a result of the irreparable injury that plaintiffs would suffer in the absence of injunctive relief and the inadequacy of any remedy at law, a denial of their motion for a preliminary injunction will cause far greater harm to the plaintiffs than the harm that would be suffered by the defendant upon the granting of a preliminary injunction. The defendant has asserted that it "has no income from which to pay plaintiffs or any of its other creditors. Moreover, even if the Court were to order payment and force defendant into bankruptcy, defendant would still not be able to pay since all of its assets are pledged to secured creditors." Defendant's Prehearing Memorandum at 21. In *Central States, Southeast and Southwest Areas Pension and Health & Welfare Funds v. McNamara Motor Express, Inc.*, 503 F.Supp. 96 (W.D.Mich.1980), a case in which the District Court issued an injunction requiring the employer to make contributions, pursuant to a collective bargaining agreement, to funds providing health care insurance and other benefits to employees, the court balanced the equities in the following manner:

> Moreover, while defendant alleges that it will be substantially harmed by issuance of an injunction, I am convinced that harm to plaintiffs, as set out above, is greater. *Admittedly, defendant's precarious financial position is threatened by a court order requiring payment. However, concern over insolvency cannot be used by defendant to evade its responsibilities. Defendant has admitted its obligations under the funds. It*

*would be improper for the court to defer enforcement of these obligations merely because defendant could go bankrupt. It is not the court's role to protect defendant from creditors "nipping at its heels."* In granting preliminary relief, this court would simply be maintaining the status quo, one of Congress' primary purposes in enacting Rule 65 of the Federal Rules of Civil Procedure.

*McNamara Motor Express,* 503 F.Supp. at 99 (emphasis added). *See also, Van Drivers Union Local No. 392 v. Neal Moving & Storage,* 551 F.Supp. 429, 433 (N.D.Ohio 1982), *enforcing,* 557 F.Supp. 187 (1983). Here, similarly, concern about defendant's insolvency and the possibility of bankruptcy cannot be used by defendant to evade its responsibilities. Therefore, insolvency, and even the possibility of bankruptcy, cannot be given more weight than the irreparable harm to the plaintiffs and the balance must tip greatly in favor of the plaintiffs.

Finally, this Court finds that the public interest would be served by the issuance of preliminary injunctive relief. As discussed earlier, Congress has plainly stated in ERISA that "[i]t is hereby declared to be the policy of this Act to protect ... the interests of participants in employee benefit plans and their beneficiaries ... by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). The plaintiffs have demonstrated irreparable harm and thereby their need for protection by this Court. In light of the plaintiffs' status as beneficiaries of an employee benefit plan that was established to provide them with health care protection and defendant's obligation to maintain that plan, the public interest is better served by the issuance of a preliminary injunction than by its denial.

Therefore, this Court concludes that the issuance of a preliminary injunction is appropriate at this time and plaintiffs' motion for a preliminary injunction is GRANTED.

Upon the foregoing,

IT IS ORDERED that a preliminary injunction shall issue in the following form:

Defendant Satralloy, Inc. shall provide the benefits due under the employee benefit plan provided for in the collective bargaining agreements between Satralloy, Inc. and the United Steelworkers of America.

Pursuant to the Court's authority under Rule 65(c) to order the proper amount of security, in consideration of the financial condition of the plaintiffs, the likelihood of their success on the merits, the defendant's admission of its obligation to maintain the plan, and the remoteness of any damage to defendant if the order should be deemed wrongfully granted, the Court will not require the filing by the plaintiffs of a bond.

IT IS SO ORDERED.

## ON MOTION FOR STAY PENDING APPEAL

### I. INTRODUCTION

█ This case is now before the Court upon defendant's motion pursuant to Rule 62(c) of the Federal Rules of Civil Procedure for a stay pending appeal of this Court's order granting plaintiffs a preliminary injunction, under which defendant Satralloy is required to "provide the benefits due under the employee benefit plan provided for in the collective bargaining agreements between Satralloy, Inc. and the United Steelworkers of America." *Mamula v. Satralloy,* 578 F.Supp. 563 (S.D.Ohio Sept. 7, 1983) (hereinafter *Satralloy*).

### II. LEGAL ANALYSIS

#### A. CRITERIA FOR ISSUANCE OF A STAY PENDING APPEAL

"Motions for stays of injunctive orders pending review consistently result in an application of the four-part test enunciated in *Virginia Petroleum Jobbers Ass'n v. FPC,* 104 U.S.App.D.C. 106, 259 F.2d 921 (1958)." *Roe v. Ferguson,* 389 F.Supp. 393, 394 (S.D.Ohio 1974). *See also, Reed v. Rhodes,* 549 F.2d 1046 (6th Cir.1976), *stay order of single judge vacated on other grounds,* 549 F.2d 1050 (6th Cir.1976); *Hamlin Testing Laboratories, Inc. v.*

*United States Atomic Energy Comm'n,* 337 F.2d 221, 222 (6th Cir.1964). The burden of the party requesting the stay is to show the following:

1. It will succeed on the merits of its appeal;

2. It will suffer irreparable injury unless the stay is granted;

3. Plaintiffs will not be substantially harmed by the stay; and

4. No harm will be done to the public interest.

"Although the above criteria must be applied individually to the facts of this case, the ultimate decision by the Court must be made in light of all the criteria, unless the movant's claim is so palpably devoid of any showing of irreparable injury or probability of a successful appeal that further consideration of other factors would be futile." *Evans v. Buchanan,* 435 F.Supp. 832, 842 (D.Del.1977).

### B. LIKELIHOOD OF SUCCESS ON THE MERITS

A literal reading of the first criterion, that defendant show it is likely to succeed on the merits of its appeal, has not been adopted by courts that have applied it. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843–44 (D.C.Cir.1977); *Goldstein v. Miller,* 488 F.Supp. 156, 172–73 (D.Md. 1980), *cert. denied,* 454 U.S. 828, 102 S.Ct. 121, 70 L.Ed.2d 104 (1981); *Evans,* 435 F.Supp. at 843–44; *Roe,* 389 F.Supp. at 395. This is so because a literal reading would seem to require a district court to determine that it had erred in its original ruling, and such a requirement would probably lead to consistent denials of motions to stay. *Evans,* 435 F.Supp. at 843. Rather, these courts have interpreted the first criterion to be satisfied by a showing that "the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear," *Evans,* 435 F.Supp. at 844, or that "some of the issues raised in [this case] present serious questions of first impression." *Goldstein,* 488 F.Supp. at 175.

Defendant, in the case *sub judice,* contends that "the question of the application of the Norris-LaGuardia Act is a difficult legal problem with ample ground for dispute," and that "[t]he resolution of the Norris-LaGuardia issue presented herein is central to the exercise of this Court's injunctive powers." Defendant's Memorandum in Support of Motion for Stay at 4–5 (hereinafter Defendant's Memorandum). In support of these contentions, defendant characterizes this Court's holding in its order granting plaintiff's motion for a preliminary injunction, as follows: "No other Court has held squarely, as did this Court, that the *Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) exception to the Norris-LaGuardia Act is broad enough to permit injunctive relief under the circumstances presented in this case." Defendant's Memorandum at 4. This statement by defendant, however, does not correctly characterize this Court's holdings in its original Memorandum and Order. Because this Court's holdings have apparently been misunderstood, this Court will attempt to restate as clearly as possible its holdings and the grounds underlying them.

This Court did not hold that the facts of this case fit within the *Boys Markets* exception to the Norris-LaGuardia Act. A careful reading of this Court's opinion, instead, reveals that this Court first held that the failure of defendant employer to make the premium payments under the employee benefit plan—payments which defendant does not dispute it owes—was not a part and parcel of the abuses against which the Norris-LaGuardia Act was aimed. *Satralloy,* at 574–575. This Court determined that as a matter of statutory construction and legislative history, the Norris-LaGuardia Act would not bar an injunction against the employer under the facts of this case.

Secondly, this Court held on the basis of the clearly stated policy of the Employee Retirement Income Security Act (hereinafter ERISA) in subsection 2(b), the express language of subsection 502(a)(3), that section's legislative history, and the reason-

ing and conclusion of the Sixth Circuit Court of Appeals in *Laborers Fringe Benefit Funds—Detroit and Vicinity v. Northwest Concrete & Construction, Inc.*, 640 F.2d 1350 (6th Cir.1981), that Congress undoubtedly intended to permit federal courts to issue injunctions and other appropriate relief in cases brought under subsection 502(a)(3) of ERISA. The opposite interpretation of subsection 502(a)(3)—that Congress did not intend to provide a limited accommodation to the Norris-LaGuardia Act for cases arising under that subsection—would render nugatory the plain language of subsection 502(a)(3) authorizing injunctive relief and the declaration of congressional policy in subsection 2(b). Under subsection 502(a)(3), the persons who may bring a civil action to enjoin violations of ERISA are the participants, beneficiaries and fiduciaries of the employee benefit plan. Employees are empowered to bring suit under subsection 502(a)(3) as participants or beneficiaries, as in the instant case, and trustees of the fund and the fund itself are empowered to bring suit under subsection 502(a)(3) as fiduciaries, as in *Northwest Concrete* and *Central States, Southeast and Southwest Areas Pension Fund v. Admiral Merchants Motor Freight, Inc.*, 511 F.Supp. 38 (D.Minn. 1980), *aff'd*, 642 F.2d 1122 (8th Cir.1981). Therefore, Congress must have intended, by the specific authorization of injunctive and other appropriate relief in either of these situations under subsection 502(a)(3), to provide for a limited accommodation with the anti-injunction provisions of the Norris-LaGuardia Act.

Defendant points out that "the Supreme Court has recently reaffirmed the view that exceptions to the prohibitions of the Norris-LaGuardia Act are to be narrowly construed," citing *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n*, 457 U.S. 702, 102 S.Ct. 2673, 73 L.Ed.2d 327 (1982). The Supreme Court's observation, however, reads in full, as follows: "This Court has consistently given the anti-injunction provisions of the Norris-LaGuardia Act a broad interpretation, *recognizing exceptions only in limited situations where necessary to accommodate the Act to specific federal legislation or paramount congressional policy.*" *Jacksonville Bulk Terminals*, 457 U.S. at 708, 102 S.Ct. at 2678 (emphasis added). Subsection 502(a)(3) of ERISA constitutes "specific federal legislation" that requires recognition of a limited accommodation with the strictures of the Norris-LaGuardia Act.

In recognizing what has become known as the *"Boys Markets* exception," the Supreme Court was not deterred by the failure of Congress to declare in the legislative history or elsewhere that section 301 of the Labor Management Relations Act (hereinafter LMRA), 29 U.S.C. § 185, was intended to provide an exception to the anti-injunction provisions of the Norris-LaGuardia Act. Moreover, as Justice Black correctly noted in dissent, subsection 301(a) "says nothing at all about granting injunctions." *Boys Markets*, 398 U.S. at 256, 90 S.Ct. at 1595 (Black, J., dissenting). In subsection 502(a)(3) of ERISA, on the other hand, Congress expressly empowered federal courts to issue injunctions and other appropriate relief in cases brought under that provision, thereby unambiguously expressing Congress' intent to provide for a narrow accommodation with the Norris-LaGuardia Act's anti-injunction provisions.

In *Boys Markets*, without the aid of such an unambiguous expression of Congressional intent, the Supreme Court looked to the important federal policy favoring arbitration of labor disputes underlying the statute in question, section 301 of the LMRA, as well as the need to accommodate that policy with the one underlying the Norris-LaGuardia Act. The Supreme Court reasoned, as follows:

> Clearly employers will be wary of assuming obligations to arbitrate specifically enforceable against them when no similarly efficacious remedy is available to enforce the concomitant undertaking of the union to refrain from striking. On the other hand, the central purpose of the Norris-LaGuardia Act to foster the growth and viability of labor organiza-

tions is hardly retarded—if anything, this goal is advanced—by a remedial device that merely enforces the obligation that the union freely undertook under a specifically enforceable agreement to submit disputes to arbitration.

*Boys Markets*, 398 U.S. at 252–53, 90 S.Ct. at 1593–94 (footnote omitted). In addition to the specific empowering of federal courts to issue injunctions under subsection 502(a)(3) of ERISA, the reasoning employed by the Supreme Court in *Boys Markets* regarding subsection 301(a) of the LMRA is equally applicable to subsection 502(a)(3) of ERISA. Congressional findings are set forth in subsection 2(a) of ERISA, which provides as follows:

> Congress finds that ... the continued well-being and security of millions of employees and their dependents are directly affected by [employee benefit] plans; that they are affected with a national public interest; *that they have become an important factor affecting the stability of employment and the successful development of industrial relations.*

Subsection 2(a), 29 U.S.C. § 1001(a) (emphasis added). Congress further "declared to be the policy of this Act to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries ... by providing for appropriate remedies, sanctions, and ready access to the Federal courts." Subsection 2(b), 29 U.S.C. § 1001(b). Moreover, as in the *Boys Markets* exception, the central purpose of the Norris-LaGuardia Act to foster the growth and viability of labor organizations is hardly retarded—if anything, this goal is advanced—by a remedial device that merely enforces the obligation that the employer freely undertook under a specifically enforceable agreement to establish and maintain the employee benefit plan. Therefore, the congressional implementation of the above-quoted policy of ERISA by the provision for the issuance of injunctions and other appropriate relief in cases brought under subsection 502(a)(3) is consistent with the purpose of the Norris-LaGuardia Act, although it requires, as in *Boys Markets*, accommodation with the literal language of the Norris-LaGuardia Act's anti-injunction provisions.

This Court emphasizes that it did *not* hold that the *Boys Markets* exception to the Norris-LaGuardia Act applies in this case. Instead, this Court held that the case fell within the narrow area of accommodation with the anti-injunction provisions in the Norris-LaGuardia Act provided for by Congress in ERISA. The accommodation provided for in subsection 502(a)(3) of ERISA is analogous to but separate from the "exception" recognized by the Supreme Court in *Boys Markets*. Therefore, the two cases cited by defendant in support of its argument that injunctive relief is not appropriate in this case because the *Boys Markets* exception does not extend to the facts herein are inapposite. *Local 692, United Food and Commercial Workers Union v. Pantry Pride, Inc.*, 522 F.Supp. 1009, 1013 (D.Md.1981); *Automobile Mechanics Local No. 701 v. Larry Faul Oldsmobile, Inc.*, 524 F.Supp. 5 (N.D.Ill.1980). These two cases are distinguishable on the same ground that this Court in its original Memorandum and Order distinguished the cases of *Heheman v. E.W. Scripps Co.*, 661 F.2d 1115 (6th Cir.1981), *cert. denied*, 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982), and *In re Crowe & Associates, Inc.*, 713 F.2d 211 (6th Cir.1983)—in none of those cases were the causes of action brought, as in the instant case, under subsection 502(a)(3) of ERISA.

Defendant argues that even if its understanding of the law is incorrect, it has nevertheless satisfied the first criterion to obtain a stay pending appeal because this Court has preliminarily resolved a "serious question in an area where the law is somewhat unclear." *Evans*, 435 F.Supp. at 844. While this Court has no doubt about the correctness of its decision, given the weak showing apparently required by the first criterion regarding the issuance of a stay pending appeal, this Court must conclude that defendant has shown that this case presents a serious question in an area in which the law is *somewhat* unclear.

## C. IRREPARABLE INJURY

Defendant argues that it has satisfied the second criterion, that it will suffer irreparable injury unless the stay is granted, because of its allegation that any requirement that defendant pay the insurance premiums at issue in this case will thrust it into bankruptcy and will destroy any hope of future economic viability for defendant as well as the reemployment of its laid-off employees. In support of this argument, defendant contends that "destruction of the economic enterprise is the kind of irreparable harm warranting a stay," citing *Washington Metropolitan Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 843 n. 2 (D.C.Cir.1977), and *Goldstein*, 488 F.Supp. at 175. Defendant's Memorandum at 6.

The factual situation presented in this case, however, is significantly different from that in both *Holiday Tours* and *Goldstein*. In this case, defendant Satralloy has unequivocally admitted its obligation to do what this Court has ordered it to do—"provide the benefits due under the employee benefit plan provided for in the collective bargaining agreements between Satralloy, Inc. and the United Steelworkers of America." *Satralloy*, at 579. In addition to the admissions made by Satralloy early in this litigation, recounted in *Satralloy*, at 568, counsel for Satralloy at the hearing on defendant's motion for a stay pending appeal reaffirmed Satralloy's admission of its obligation to provide the benefits in question, as follows:

> THE COURT: There has never been a dispute at any time throughout this entire case regarding Satralloy's obligation to make these monthly payments and to provide the insurance for its employees? That has never been an issue?
>
> MR. ALEXANDER: That's correct.

Transcript of Proceedings, Dec. 22, 1983, p. 4.

Furthermore, the threat of bankruptcy is quite different in this case from that in *Holiday Tours* and *Goldstein* because here whatever decision the Sixth Circuit Court of Appeals renders on this Court's holding concerning Congress' accommodation of ERISA to the Norris-LaGuardia Act will not change the acknowledged obligation of defendant to provide the benefits in question.

> THE COURT: But on the question of the bankruptcy, Mr. Alexander, the threat of bankruptcy is the result, is it not, of the allegedly dire financial condition of Satralloy? It simply is in financial straits such that it cannot meet its obligations?
>
> MR. ALEXANDER: That's correct, your Honor.
>
> THE COURT: That at least is the allegation that Satralloy has made throughout. All my injunction did was to direct and compel Satralloy to meet its obligation under the contract regarding these insurance premiums, an obligation which Satralloy from the very outset of this proceeding acknowledged?
>
> MR. ALEXANDER: That's correct.
>
> [THE COURT:] Even if the Court of Appeals would agree with your legal argument, your question of law that you raise in your brief that the Norris-LaGuardia Act restricted this Court in terms of any injunctive relief, even if that should be the finding of the Court of Appeals ultimately down the road, a long way down, none of that changes the fact that Satralloy owes this obligation and that a judgment for money damages could be rendered by this Court; isn't that true?
>
> MR. ALEXANDER: That's true. It's true that the Court could render a money judgment.

Transcript of Proceedings, Dec. 22, 1983, pp. 4, 12. Therefore, the instant case does not involve a situation, such as the one in *Holiday Tours* and *Goldstein*, in which the liability of defendant is in dispute and judgment should be stayed to protect defendant from the economic collapse that would result from compliance with the district court's order. In the case *sub judice*, defendant's claim that it will go into bankruptcy if this Court's injunction is not stayed might or might not be true, but even if true it is not this Court's order that

will force defendant to go into bankruptcy. Rather, defendant's debts are such that it might not be able to stay in business. This Court did not create the obligation defendant freely admits it has to plaintiffs; this Court is simply enforcing that obligation. Many employers in today's economy are suffering difficult times, but the threat of bankruptcy cannot be used to prevent creditors from enforcing their rights. The threat of bankruptcy in this case is not the type of irreparable harm encompassed within the second criterion for obtaining a stay.

This Court notes that counsel for plaintiffs has stated that plaintiffs "are aware that if this Court should deny a stay, that at least according to the allegations of Satralloy, that might well precipitate Satralloy going into bankruptcy." (Transcript of Proceedings, Dec. 22, 1983, p. 17.) Defendant has held out the hope that the plant might reopen someday thereby allowing reemployment of plaintiffs and payment of benefits owed to them, but defendant can make no assurances that this hope will ever be realized. (Transcript of Proceedings, Dec. 22, 1983, p. 9.) Plaintiffs obviously view the request for a stay as a means to buy time and in full recognition of the threat of bankruptcy have chosen to seek the present enforcement of their rights.

Defendant raised at the hearing on its motion for a stay pending appeal a second ground for this Court to find irreparable harm.

THE COURT: What Satralloy seeks to do, it seems to me, my impression is, at least, by this argument, Satralloy is in effect asking the Court to stay its injunction not because of any dispute over the obligation that is being enforced by that injunction, but Satralloy seeks a stay in order to protect Satralloy from the necessity of going into bankruptcy. I am assuming Satralloy would make perhaps the same argument if one of its major creditors, one of the banks to which it is indebted, for example, obtained a judgment and sought to levy execution on that judgment. I am assuming Satralloy again would perhaps make the same argument: "Don't do this, because if you do this, we will be forced into bankruptcy."

MR. ALEXANDER: Actually, your Honor, in that situation, if there were a money judgment, Satralloy would be in a slightly different position because as the Court is well aware right now, Satralloy faces an injunction with possible contempt proceedings down the line if it's unable to pay, which it's not. If a money judgment were on, Satralloy's adverse party would have an opportunity to collect that judgment in the proceedings permitted by law, and I am confident from my discussions with Satralloy and the evidence in the record as I understand it is that they simply have no ability to pay and the judgment would be uncollectible.

But what we are faced with here is an equitable order with potential contempt remedies, and that is the irreparable harm that Satralloy is so concerned about, because if we're unable to comply with the Court's order and have no opportunity to seek review of that order and equitable injunctive power of that order, then Satralloy may well be faced with contempt proceedings.

Transcript of Proceedings, Dec. 22, 1983, pp. 4–6.

This Court is convinced, however, that the presence in this case of an equitable order with potential contempt remedies does not constitute irreparable harm. Plaintiffs' counsel agreed that if this Court and the Sixth Circuit Court of Appeals did not issue a stay, if Satralloy did not comply with this Court's original order, if plaintiffs then sought an order holding Satralloy in contempt of this Court's injunction, and if Satralloy could clearly and convincingly establish that it absolutely has no means, by borrowing or otherwise, of complying with this Court's injunction, then under those circumstances this Court would not be able to hold it in contempt. (Transcript of Proceedings, December 22, 1983, pp. 14–15.) *See Maggio v. Zeitz,* 333 U.S. 56, 69–73, 68 S.Ct. 401, 408–09, 92 L.Ed. 476 (1948);

*O'Leary v. Moyer's Landfill, Inc.*, 536 F.Supp. 218, 219-20 (E.D.Pa.1982). Because Satralloy could be held in contempt only if it failed to comply with this Court's injunction when it was financially able to comply, this Court finds the possibility that defendant could be held in contempt of this Court does not constitute irreparable harm under the circumstances of this case.

This Court has concluded that defendant Satralloy has failed to satisfy the second criterion for the issuance of a stay in that it has not demonstrated it will suffer irreparable injury should its motion for a stay be denied. Nevertheless, this Court deems it advisable to continue the analysis of the propriety of granting a stay in this case by considering the last two criteria even though defendant has failed to satisfy the second criterion.

### D. SUBSTANTIAL HARM TO PLAINTIFFS

Defendant argues that the third criterion, that plaintiffs will not be substantially harmed by the stay, is satisfied here because plaintiffs will suffer no incremental harm by presenting their legal arguments in the Court of Appeals rather than in a bankruptcy court. Defendant's Memorandum at 7. As discussed above, however, plaintiffs are fully aware of defendant's threat of bankruptcy and have chosen to seek immediate enforcement of their rights. This Court has reconsidered the question of irreparable harm to plaintiffs and concludes that its original finding that plaintiffs will suffer irreparable harm in the absence of injunctive relief applies with equal force to the question of a stay. See discussion in *Satralloy*, at 577-579. Therefore, this Court is convinced that plaintiffs would be substantially harmed by the issuance of a stay.

### E. HARM TO THE PUBLIC INTEREST

Finally defendant contends that the public interest would be served by the issuance of a stay because if "the stay is not granted, bankruptcy will follow thereby precluding appellate review by defendants of the Court's orders." Defendant's Memorandum at 8. As this Court discussed earlier, if defendant goes into bankruptcy it will not be because of this Court's orders or the denial of the stay; defendant admits its obligation to provide the benefits in question. Moreover, defendant's assertion is premised on its earlier contention that if the stay is not granted it will have to choose between bankruptcy and contempt of court. As this Court has indicated, however, defendant will not have to face the possibility of being held in contempt of this Court's injunction so long as it has accurately represented and can clearly and convincingly demonstrate to this Court that it is absolutely unable to discharge its obligation to plaintiffs.

Defendant's second argument that the public interest would be served by the issuance of a stay is premised on its belief that this Court's holding in the original Memorandum and Order constituted an expansion of the *Boys Markets* exception to the Norris-LaGuardia Act. As this Court has emphasized in this Memorandum and Order, however, its holding is not that the *Boys Markets* exception applies to this case—a holding that would have been unprecedented and incorrect. Rather, this Court's holding was based upon the congressional intent expressed in the specific and unambiguous language of subsections 2(a) and (b) and 502(a)(3) of ERISA, that statute's legislative history, and the reasoning and conclusion of the United States Sixth Circuit Court of Appeals in *Northwest Concrete*.

Additionally, this Court has reconsidered the question of harm to the public interest and concludes that its finding that the public interest would be served by the issuance of preliminary injunctive relief applies with equal force to the question of a stay. See discussion in *Satralloy*, at 579. Therefore, this Court is convinced that harm would be done to the public interest should a stay be granted in this case.

### III. CONCLUSION

For the foregoing reasons, this Court concludes that defendant's motion for a stay pending appeal must be DENIED.

IT IS SO ORDERED.